## MANESS v. MEYERS, JUDGE

No. 73–689.   Argued October 22, 1974—Decided January 15, 1975

BURGER, C. J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, MARSHALL, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed an opinion concurring in the result, in which BLACKMUN, J., joined, *post*, p. 470. WHITE, J., filed an opinion concurring in the result, *post*, p. 472.

*William F. Walsh* argued the cause for petitioner. With him on the briefs were *Stuart M. Nelkin* and *Michael Anthony Maness pro se.*

*Joe B. Dibrell* argued the cause for respondent. With him on the briefs were *John L. Hill*, Attorney General of Texas, *Larry F. York*, First Assistant Attorney General, and *Lonny F. Zwiener*, Assistant Attorney General.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether in a state civil proceeding a lawyer may be cited for contempt for advising his client, a party to the litigation, that the client may refuse on Fifth Amendment grounds to produce subpoenaed material.

## I

Petitioner is a lawyer. In January 1973 his client was convicted before a Municipal Court in the city of Temple, Texas, of selling seven obscene magazines in violation of a Temple ordinance. Six days later the client, Michael McKelva, was served by a Bell County deputy sheriff with a subpoena *duces tecum* directing him to produce 52 magazines before the 169th Judicial District Court. The titles of the magazines were given, but no other description was contained in the warrant.

Under the Texas Penal Code[1] upon application by

---

[1] Texas Penal Code, Art. 527 (Supp. 1973), regulates distribution of obscene articles. Generally, it provides criminal penalties for specific acts of distribution. In § 13, however, it provides for an injunction to enforce its other provisions:

"Sec. 13. The district courts of this State and the judges thereof shall have full power, authority, and jurisdiction, upon application by any district, county, or city attorney within their respective jurisdictions, or the Attorney General to issue any and all proper restraining orders, temporary and permanent injunctions, and any other writs and processes appropriate to carry out and enforce the pro-

any city attorney the district courts may issue injunctions to prevent illegal distribution of obscene matter. The subpoena here was requested by the Temple City Attorney in order to obtain such an injunction. Besides commanding production of the magazines it ordered petitioner's client to appear at a hearing on February 1, 1973, and give testimony.

McKelva appeared represented by petitioner and an associate, Karl A. Maley. Earlier, Maley had filed a written motion to quash the subpoena. The motion claimed, *inter alia*, that the issuance of the subpoena was merely an attempt to require materials and testimony in violation of McKelva's constitutional right not to incriminate himself.

At the hearing petitioner orally argued the motion to quash. He, too, contended that the city was attempting, through a civil proceeding, to discover evidence which properly should be discovered, if at all, through criminal process. He freely admitted that the magazines dealt explicitly with acts of a sexual nature, and that they were "of the same character" as the magazines for distribu-

---

visions of this article. Such restraining orders or injunctions may issue to prevent any person from violating any of the provisions of this article. However, no restraining order or injunction shall issue except upon notice to the person sought to be enjoined. Such person shall be entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial. In the event that a final order or judgment of injunction be entered against the person sought to be enjoined, such final order or judgment shall contain a provision directing the person to surrender to the sheriff of the county in which the action was brought any obscene matter in his possession and such sheriff shall be directed to seize and destroy such matter." The entire article was repealed by Acts 1973, 63d Leg., c. 399, § 3 (a), p. 992, effective January 1, 1974. The new law does not seem to have any provision equivalent to § 13.

tion of which McKelva previously had been convicted.[2] Thus, he argued, it was quite clear that a "substantial possibility of self-incrimination" existed if McKelva was required to produce the magazines. Petitioner foresaw possible criminal prosecution either under the Temple ordinance [3] again, or under Art. 527 itself.

Although petitioner claimed the Fifth Amendment's protection was available in any proceeding whether civil or criminal, he also urged that under the circumstances the injunctive proceeding for which the magazines were subpoenaed was quasi-criminal in nature. He noted that it was brought under the Penal Code of Texas and concluded that the city should secure a search warrant, describing with particularity the magazines it desired produced.

The City Attorney responded that the proceeding was purely civil and that "there is no contention on the part of the City or any attempt on the part of the City to get any evidence for any criminal prosecution," and thus any material produced would not be incriminating. Further, he maintained, because there "are no criminal sanctions . . . there will be no evidence that would be incriminating under the rules . . . ."

In reply petitioner drew an analogy to tax cases where, he argued, courts have prohibited the Internal Revenue

---

[2] The parties stipulated that the conviction had occurred and was then under appeal.

[3] It appears that the Temple city criminal ordinance dealing with obscenity is substantially identical to the criminal provisions of Art. 527. Texas Penal Code, Art. 527, § 12 (Supp. 1973), provides:

"Sec. 12. No city, county or other political subdivision may enact any regulation of obscene material which conflicts with the provisions of this Act; however, a city, county, or other political subdivision is authorized to regulate further the means and manner of distribution and exhibition of matter."

At the hearing the court took judicial notice of the similarity between Art. 527 and the Temple criminal ordinance. App. 29.

Service from using subpoenas to discover records which might tend to incriminate taxpayers. Petitioner contended that the nature of the proceeding in which evidence is sought is irrelevant to the compass of the Fifth Amendment, and that the character of the material requested is the only relevant inquiry. He asserted that the sole test is whether production of the material would create a substantial probability of criminal prosecution for his client. He noted that the City Attorney's representation that the city is not interested in a criminal prosecution "certainly does not bind for example the County Attorney, or anyone else . . . who might be interested in prosecuting such a case."

The court then denied the motion to quash and petitioner's client, McKelva, took the stand. In answer to preliminary questions he gave his name and address and stated that he was the operator of Mike's News in Temple. He admitted to having been served with the subpoena, but when he was asked whether he had brought the magazines he replied: "[U]nder the advice of Counsel, I refuse to answer on the grounds that it may tend to incriminate me." The City Attorney then moved the court to instruct the witness to answer, and if he failed to do so to hold him in contempt. The court asked petitioner's cocounsel what would be a reasonable time to allow for the witness to bring the magazines into court, because the court understood the applicable rule to require time for compliance before a motion for contempt should be entertained. Counsel replied that according to their position no time need be allowed because, in any event, the subpoena would require production of evidence which would tend to incriminate the witness. The court then recessed until the afternoon and instructed the witness to return at that time with the requested magazines. Petitioner's cocounsel said he understood the instruction.

454

When the court reconvened, McKelva was recalled, and he responded negatively when the City Attorney asked whether he had made any effort to obtain the subpoenaed magazines. He did, however, acknowledge that he had understood the court's order to bring them. After he indicated that the sole reason for his failure to comply was his belief that if he did so it would entail a substantial possibility of self-incrimination, the City Attorney again moved for a contempt citation. This time the court found McKelva in contempt and stated that the failure to respond would be treated as an admission that the subpoenaed magazines are obscene. Petitioner objected, arguing that a person may not be penalized for asserting a constitutional right by way of making an adverse finding against him. The judge replied that no finding had been made, but in view of petitioner's admission that the magazines were of the same nature as those for which his client previously had been convicted, there was justification for treating a refusal to produce them as an admission to be considered with other evidence.[4] Petitioner responded that he was obliged to assert that although the other magazines had been held obscene the subpoenaed magazines were not.

After other testimony was heard, McKelva was again recalled and the court asked him if his disobedience was his own decision, or if it was on the advice of counsel. McKelva replied that it was on the advice of counsel, specifically petitioner and Maley. Petitioner then asked his client whether he would produce the magazines if counsel advised him they were not incriminatory. McKelva replied that he would. This made it clear that but for the advice of counsel McKelva would have produced the subpoenaed matter.

---

[4] The correctness of the conclusion as to inferences to be drawn from a witness' failure to respond is not before us for decision.

After a short recess the court ruled the subpoenaed magazines obscene, and enjoined their continued exhibition and sale. Finally, the court held petitioner and his cocounsel in contempt, as well as their client,[5] and fixed punishment for each of them at 10 days' confinement and a $200 fine.

The judge noted his reluctance to find the attorneys in contempt, stating this was the first time he had ever done so, but he felt that the attorneys had usurped the authority of the court: "This Court has not been permitted to rule on the admissibility of that evidence. You have ruled on it . . . ." Before the hearing ended, however, petitioner stated that he and his cocounsel had not deliberately and intentionally attempted to frustrate the court. Petitioner felt there was merely a philosophical difference between counsel and the court as to the scope of the Fifth Amendment protection. The court responded that the self-incrimination defense could have been reached either by a motion to suppress the evidence after it had been produced for injunctive purposes, or by an objection to an attempt to introduce it at a criminal trial.

The record shows no indication whatsoever of contumacious conduct on the part of petitioner or his cocounsel. The court appears to have been offended, in a strictly legal sense, only by the lawyers' advice which caused their client to decline on Fifth Amendment grounds to produce subpoenaed material. There is nothing in the record to suggest that petitioner or his cocounsel acted otherwise than in the good-faith belief that if their client produced the materials he would run a substantial risk of self-incrimination.

---

[5] The only question presented here is the validity of the contempt penalty imposed upon the attorney. The validity of the contempt penalty imposed on petitioner's client is not before us.

The day the contempt citation was issued petitioner, on behalf of McKelva, applied to the Supreme Court of Texas for an original writ of habeas corpus. The same day that court denied the application pending further information to complete the record, and then finally denied the writ on February 5, 1973.

On February 8, 1973, petitioner filed an application on behalf of McKelva for a writ of habeas corpus in the United States District Court for the Western District of Texas, Waco Division. However, at 10 a. m. that day the judge who issued the contempt citation ordered McKelva released from custody although he had only served seven of his 10 days. The release was "for good behavior."

Pursuant to Texas procedure [6] the citation of the attorneys was reviewed by another state district judge, the respondent here, Judge James R. Meyers. A hearing was held on May 11, 1973, with the Texas Attorney General's office appearing in support of the contempt

---

[6] "Art. 1911a.  Contempt; power of courts; penalties

.          .          .          .          .

"Penalties for contempt
"Sec. 2.  (a) Every court other than a justice court or municipal court may punish by a fine of not more than $500, or by confinement in the county jail for not more than six months, or both, any person guilty of contempt of the court.

.          .          .          .          .

"(c) Provided, however, an officer of a court held in contempt by a trial court, shall, upon proper motion filed in the offended court, be released upon his own personal recognizance pending a determination of his guilt or innocence by a judge of a district court, other than the offended court.  Said judge to be appointed for that purpose by the presiding judge of the Administrative Judicial District wherein the alleged contempt occurred.
"Confinement to enforce order
"Sec. 3.  Nothing in this Act affects a court's power to confine a contemner in order to compel him to obey a court order."  Tex. Rev. Civ. Stat., Art. 1911 (Supp. 1974–1975).

citation. The parties agreed that the burden of proof was on the Attorney General, and also agreed that the record of the injunction hearing would provide the basis for the court's decision.

The court noted that it felt that the record supported a finding beyond a reasonable doubt that the client was advised not to bring the materials, and the court was dubious that materials displayed for public sale are protected by the Fifth Amendment. However, the court also stated, "I think it is a very close point." Counsel for petitioner agreed that the record clearly reflected that petitioner had *advised* his client that he had a Fifth Amendment privilege on the issue, but claimed that it did not reflect that petitioner had *instructed* him not to bring the subpoenaed materials.

On October 1, 1973, Judge Meyers affirmed the finding of contempt but changed the penalty to a $500 fine with no confinement. It is that judgment which is under review here.

Both Texas appellate courts refused to review the judgment. The Texas Court of Criminal Appeals denied petitioner's motion for leave to file an original application for a writ of habeas corpus, and the Supreme Court of Texas also denied a petition for a writ of habeas corpus. Both courts' orders were entered October 11. By order of Judge Meyers, personal recognizance bonds of petitioner and Maley were continued in order that Maley could seek a writ of habeas corpus from the United States District Court for the Western District of Texas and petitioner could petition for a writ of certiorari from this Court.

On December 20, 1973, Judge Jack Roberts of the United States District Court for the Western District of Texas, Waco Division, granted Maley's petition for a writ of habeas corpus. He noted that even incorrect

orders from courts ordinarily must be obeyed until set aside, but he concluded that McKelva had asserted a valid Fifth Amendment privilege, and therefore neither he nor his lawyer could be held in contempt for asserting that privilege. Since civil and criminal liability under Art. 527 arise from the same act the judge also concluded that the Fifth Amendment applied even in the injunctive action. Indeed, he noted that the leading case of *Boyd* v. *United States*, 116 U. S. 616 (1886), involved forfeiture proceedings which, "though they may be civil in form, are in their nature criminal." *Id.*, at 634. He held that since Maley was only acting to protect rights guaranteed by the Constitution to his client, "he cannot be held in contempt."

An appeal has been filed from that judgment and is now pending before the United States Court of Appeals for the Fifth Circuit. On April 15, 1974, we granted the petition for a writ of certiorari, 416 U. S. 934; we are advised that the case is being held pending our decision in this case.

## II

The narrow issue in this case is whether a lawyer may be held in contempt for advising his client, during the trial of a civil case, to refuse to produce material demanded by a subpoena *duces tecum* when the lawyer believes in good faith the material may tend to incriminate his client.

We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.

*Howat* v. *Kansas,* 258 U. S. 181, 189–190 (1922); *Worden* v. *Searls,* 121 U. S. 14 (1887). The orderly and expeditious administration of justice by the courts requires that "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *United States* v. *Mine Workers,* 330 U. S. 258, 293 (1947). This principle is especially applicable to orders issued during trial. *E. g., Illinois* v. *Allen,* 397 U. S. 337 (1970). Such orders must be complied with promptly and completely, for the alternative would be to frustrate and disrupt the progress of the trial with issues collateral to the central questions in litigation. This does not mean, of course, that every ruling by a presiding judge must be accepted in silence. Counsel may object to a ruling. An objection alerts opposing counsel and the court to an issue so that the former may respond and the latter may be fully advised before ruling. *United States* v. *La Franca,* 282 U. S. 568, 570 (1931). But, once the court has ruled, counsel and others involved in the action must abide by the ruling and comply with the court's orders. While claims of error may be preserved in whatever way the applicable rules provide, counsel should neither engage the court in extended discussion once a ruling is made, nor advise a client not to comply.[7] A lawyer who coun-

---

[7] In a case dealing with misconduct of attorneys but decided under the Federal Rules of Criminal Procedure, Mr. Justice Jackson discussed these same elementary propositions:

"Of course, it is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts. But if the ruling is adverse, it is not counsel's right to resist or to insult the judge—his right is only respectfully to preserve his point for appeal. During a trial, lawyers must speak, each in his own time and within his allowed time, and with relevance and moderation. These are such obvious matters that

sels his client not to comply with a court order during trial would, first, subject his client to contempt, and in addition, if he persisted the lawyer would be exposed to sanctions for obstructing the trial. Remedies for judicial error may be cumbersome but the injury flowing from an error generally is not irreparable, and orderly processes are imperative to the operation of the adversary system of justice.

When a court during trial orders a witness to reveal information, however, a different situation may be presented. Compliance could cause irreparable injury because appellate courts cannot always "unring the bell" once the information has been released. Subsequent appellate vindication does not necessarily have its ordinary consequence of totally repairing the error. In those situations we have indicated the person to whom such an order is directed has an alternative:

"[W]e have consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal. *Cobbledick* v. *United States,* [309 U. S. 323 (1940)]; *Alexander* v. *United States,* 201 U. S. 117 (1906); cf. *United States* v. *Blue,* 384 U. S. 251 (1966); *DiBella* v. *United States,* 369 U. S. 121 (1962); *Carroll* v. *United States,* 354 U. S. 394 (1957)." *United States* v. *Ryan,* 402 U. S. 530, 532–533 (1971).

we should not remind the bar of them were it not for the misconceptions manifest in this case." *Sacher* v. *United States,* 343 U. S. 1, 9 (1952).

This method of achieving precompliance review is particularly appropriate where the Fifth Amendment privilege [8] against self-incrimination is involved. The privilege has ancient roots, see, *e. g., Brown* v. *Walker,* 161 U. S. 591, 596–597 (1896); *Miranda* v. *Arizona,* 384 U. S. 436, 458–463 (1966); see especially *id.,* at 458 n. 27. This Court has always broadly construed its protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action. *Counselman* v. *Hitchcock,* 142 U. S. 547, 562 (1892); *Arndstein* v. *McCarthy,* 254 U. S. 71, 72–73 (1920). The protection does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution. *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951). In view of the place this privilege occupies in the Constitution and in our adversary system of justice, as well as the traditional respect for the individual that undergirds the privilege, the procedure described in *Ryan* seems an eminently reasonable method to allow precompliance review.

In the present case the City Attorney argued that if petitioner's client produced the magazines he was amply protected because in any ensuing criminal action he could

---

[8] This case deals only with the privilege against self-incrimination contained in the Fifth Amendment to the Constitution and made applicable to the States by the Fourteenth Amendment. *Malloy* v. *Hogan,* 378 U. S. 1 (1964). The constitutional basis for this privilege distinguishes it from other privileges established by state statute or common law such as those arising from the relation of priest and penitent, lawyer and client, physician and patient, and husband and wife. We are not now presented with questions as to the scope of privileges not found in the Constitution.

always move to suppress,[9] or object on Fifth Amendment grounds to the introduction of the magazines into evidence. Laying to one side possible waiver problems that might arise if the witness followed that course, cf. *Rogers* v. *United States,* 340 U. S. 367 (1951), we nevertheless cannot conclude that it would afford adequate protection. Without something more [10] "he would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman* v. *United States, supra,* at 486.

Our views as to the effectiveness of a later objection or motion to suppress do not conflict with *United States* v. *Blue,* 384 U. S. 251 (1966). There we said:

"Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial." *Id.,* at 255.

But the crucial distinction between that case and the instant question is that there the Government indeed "did acquire" the information. Blue had turned it over

---

[9] Counsel for respondent could cite no Texas statute or case giving assurance that the magazines would be suppressed because they were produced involuntarily so the witness could avoid a contempt citation.

[10] It is important here that the witness was not granted immunity from prosecution on the basis of any magazines he might produce. Quite the contrary, he was ordered to produce after vulnerability to prosecution had been made only too clear to him. In response to the City Attorney's assertion that he did not intend to prosecute based on the magazines, petitioner noted that the State or county might still prosecute, *supra,* at 452, 453, and neither the City Attorney nor the judge disagreed. See n. 9, *supra.*

Had the witness been granted formal immunity a different case would be presented; in that event a witness may be compelled to testify. *Kastigar* v. *United States,* 406 U. S. 441 (1972). If counsel, in the face of a grant of immunity, advised his client not to testify or produce information, a different question would be presented because the good faith of the attorney would be open to doubt.

during a civil investigation *without* asserting the Fifth Amendment privilege. Here, on the contrary, petitioner's client had not yet delivered the subpoenaed material, and he consistently and vigorously asserted his privilege. Here the "cat" was not yet "out of the bag" and reliance upon a later objection or motion to suppress would "let the cat out" with no assurance whatever of putting it back.

Thus in advising his client to resist and risk a contempt citation, thereby allowing precompliance appellate review of the claim, petitioner counseled a familiar procedure. Although it is clear that noncompliance risked both an immediate contempt citation and a final criminal contempt judgment against the witness if, on appeal, petitioner's advice proved to be wrong, the issue here is whether petitioner, as counsel, can be penalized for good-faith advice to claim the privilege.

It appears that here the trial judge rejected the Fifth Amendment claim primarily because it was raised in a civil [11] and not a criminal case. The City Attorney relied most heavily on that distinction in his argument in opposition to the motion to quash.[12] Just as vigorously, petitioner contended that the privilege against self-incrimination protected his client regardless of the nature of the proceeding. He said:

> "It is very clear that the coverage of the Fifth Amendment is not to be determined by the nature of the proceeding in which it is asserted. The Fifth

---

[11] Petitioner also argued, as we noted earlier, that the proceeding was not civil at all but rather was "quasi criminal." App. 10. He noted that the proceeding was based upon "the provisions of Section 13 of Article 527 of the Texas Penal Code." *Ibid.* He viewed the injunctive action as a mere prelude to a criminal prosecution. Thus he contended that the city should have sought the magazines with a search warrant instead of a subpoena *duces tecum*.

[12] *Id.,* at 12.

Amendment applies to all proceedings, to injunctive proceedings, to administrative proceedings, and to criminal proceedings. It applies to interrogation by Police Officers out of Court. It applies across the board. We are not talking about the context of the proceedings in which the privilege against self-incrimination is asserted. We are talking about the character of material that is sought to be taken from the person who is subject to the subpoena.

"... [T]he test in those circumstances is whether there is a substantial probability in requiring the party that is served with the subpoena to produce the evidence, which evidence would entail self-incrimination, and with the production of the magazines for possible use in a criminal prosecution, and we say that this would amount to a violation of the privilege under the Fifth Amendment, and we contend that it most certainly would, and that it must." App. 13–14.

In overruling the claimed privilege the trial judge seems to have accepted the City Attorney's contention that the claim is not available in a civil proceeding. We disagree.

In *Kastigar* v. *United States,* 406 U. S. 441 (1972), we recently reaffirmed the principle that the privilege against self-incrimination can be asserted "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." *Id.,* at 444; *Lefkowitz* v. *Turley,* 414 U. S. 70, 77 (1973); *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 94 (1964) (WHITE, J., concurring); *McCarthy* v. *Arndstein,* 266 U. S. 34, 40 (1924); *United States* v. *Saline Bank,* 1 Pet. 100 (1828); cf. *Gardner* v. *Broderick,* 392 U. S. 273 (1968). The trial judge seems to have proceeded upon the mistaken premise that petitioner's client was misadvised even to assert the privilege in a civil proceeding, regardless of its ultimate merit. This error explains the severe sanction the court placed—

albeit reluctantly—upon petitioner because his advice seemed to have caused the witness' refusal to obey.[13] Thus the issue is whether in a civil proceeding a lawyer may be held in contempt for counseling a witness in good faith to refuse to produce court-ordered materials on the ground that the materials may tend to incriminate the witness in another proceeding. We hold that on this record petitioner may not be penalized even though his advice caused the witness to disobey the court's order.

The privilege against compelled self-incrimination would be drained of its meaning if counsel, being lawfully present,[14] as here, could be penalized for advising

---

[13] Petitioner readily concedes that his advice indeed caused his client to disobey the order. When the court gave petitioner's client a final chance to purge himself of the contempt citation this colloquy took place:

"THE COURT: Mr. McKelva, you have been adjudged to be in contempt of this Court for having failed to observe a subpoena duces tecum to bring certain matters with you as a witness. In your testimony with reference to why you failed to do this, you first indicated that it was on the advice of Counsel that you were declining to obey the subpoena, and so I want to ask you directly this morning, is your disobedience to this subpoena your own decision, or is it on the advice of Counsel, and if so, what Counsel?

"A. It is on the advice of Counsel, sir, and Mr. Friedman, Mr. Maley and Mr. Maness.

"THE COURT: Does either Counsel have any questions that they want to ask this witness?

"MR. MANESS: Your Honor, I would only like to ask Mr. McKelva, in the event that his Counsel were to advise him that his privileges against self-incrimination were not endangered by producing the . . . magazines in question, whether or not under those circumstances he would produce the magazines?

"A. I would." App. 27.

Counsel thus took full responsibility for his client's acts, as, of course, his duty to his client required.

[14] Under Texas procedure and the rulings of the trial court in this case the client was undoubtedly entitled to consult with counsel at the times and in the manner he did.

his client in good faith to assert it.  The assertion of a testimonial privilege, as of many other rights, often depends upon legal advice from someone who is trained and skilled in the subject matter, and who may offer a more objective opinion.  A layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege.[15]  It is not a self-executing mechanism; it can be affirmatively waived, or lost by not asserting it in a timely fashion.  If performance of a lawyer's duty to advise a client that a privilege is available exposes a lawyer to the threat of contempt for giving honest advice it is hardly debatable that some advocates may lose their zeal for forthrightness and independence.[16]

---

[15] MR. JUSTICE STEWART would appear to extend our reasoning far beyond the confines of this case.  We do not agree that our reasoning leads "inexorably" to his conclusion.  We have here a case where retained counsel, in a proceeding which he strenuously argued was not civil but quasi-criminal, has been held in contempt for advising his client that he may assert the Fifth Amendment privilege.

Reliance seems to us misplaced on the statement in *Powell* v. *Alabama,* 287 U. S. 45, 69 (1932), that "[i]f in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him . . . such a refusal would be a denial of a hearing, and, therefore, of due process . . . ."  Comments in a *criminal* case as to the law in a *civil* case hardly reach the level of constitutional doctrine, if indeed they are any more than dicta.  From these dicta it is argued that it as much violates due process to punish an attorney for advising a witness of a privilege as to prevent the attorney from appearing at all; also that a contempt citation may "constitute an arbitrary interference with the constitutionally protected attorney-client relationship," *post,* at 472, even where no constitutional privilege is involved.  We need not go so far nor travel such a circuitous route to reach our conclusion here.  We are not aware that the Court has ever identified a "constitutionally protected attorney-client" privilege of the scope postulated by MR. JUSTICE STEWART.

[16] The American Bar Association Project on Standards for Criminal Justice, Defense Function § 1.6 (Approved Draft 1971) shows the difficulty such a situation would present for a lawyer:

"[T]he duties of a lawyer to his client are to represent his legitimate

There is a crucial distinction between citing a recalcitrant witness for contempt, *United States* v. *Ryan, supra,* and citing the witness' lawyer for contempt based only on advice given in good faith to assert the privilege against self-incrimination. The witness, once advised of the right, can choose for himself whether to risk contempt in order to test the privilege before evidence is produced. That decision is, and should be, for the witness. But, if his lawyer may be punished for advice so given there is a genuine risk that a witness exposed to possible self-incrimination will not be advised of his right. Then the witness may be deprived of the opportunity to decide whether or not to assert the privilege.

An early example of this situation is found in *In re Watts,* 190 U. S. 1 (1903). There lawyers advised their clients in good faith that state, not federal, courts had bankruptcy jurisdiction over a certain property in the hands of a state receiver. This advice led to a collision between the state and federal courts, and contempt citations for the lawyers. Although this Court held that the lawyers' advice was substantively incorrect, it refused to allow the federal contempt convictions to stand because there was no evidence the advice was given in bad faith. *Id.,* at 32. Mr. Chief Justice Fuller, speaking for the Court, said:

> "In the ordinary case of advice to clients, if an attorney acts in good faith and in the honest belief that his advice is well founded and in the just interests of his client, he cannot be held liable for error in judgment. The preservation of the independence

interests, and considerations of personal and professional advantage should not influence his advice or performance."

The introductory comments note:

"A lawyer cannot be timorous in his representation. Courage and zeal in the defense of his client's interest are qualities without which one cannot fully perform as an advocate." *Id.,* at 146.

of the bar is too vital to the due administration of justice to allow of the application of any other general rule." *Id.*, at 29.

We conclude that an advocate is not subject to the penalty of contempt for advising his client, in good faith, to assert the Fifth Amendment privilege against self-incrimination in any proceeding embracing the power to compel testimony. To hold otherwise would deny the constitutional privilege against self-incrimination the means of its own implementation. When a witness is so advised the advice becomes an integral part of the protection accorded the witness by the Fifth Amendment.

### III

In applying these principles it is important to note what this case does not involve: the claim is not based solely on privacy; this is not a case where state law is clear that a response to compulsory process under protest renders the response inadmissible in any criminal prosecution against the witness; most important, there is no contention here as to lack of good faith or reasonable grounds for assertion of a Fifth Amendment claim. Both in a pretrial written motion and orally during trial, petitioner cogently stated his reasons for believing the privilege applied:

"In view of the fact that there is this substantial possibility of self-incrimination; in view of the fact that seven other magazines that are of the same character as the . . . magazines named in the subpoena, that they have provided the basis for past criminal prosecutions; in view of the fact that criminal prosecutions are not only a very definite possibility, they are in fact a pronounced possibility, and so there is little reasonable doubt in these circumstances that the subpoena should be quashed

because in fact it seeks to compel the person named in the subpoena to incriminate himself, and, of course, this is prohibited by the Fifth Amendment to the Constitution of the United States." App. 9–10.

Petitioner stated that the magazines were "of the same character" [17] as magazines for distribution of which his client had recently suffered a criminal conviction. There was therefore, at the very least, a reasonable basis for petitioner to assume that a risk of further criminal prosecution existed.[18] Both sides agree that the record is devoid of evidence of contumacious conduct or any disrespect for the court, cf., e. g., In re Little, 404 U. S. 553, 554–555 (1972). The highly professional tone of the proceeding is revealed by the statements of the judge, and by petitioner's closing comments to the judge after he had been cited for contempt:

"If it please the Court, I certainly appreciate the Court's position. I think what we have here is not a situation, and I hope this is correct, where Counsel have deliberately and intentionally attempted to frustrate the Court. I think that rather what we have is where there is a philosophical difference between Counsel for the Defendant and the Court with regard to the applicable law as to self-incrimination and the production of evidence in a civil case." App. 32.

[17] Petitioner's concession that the subpoenaed magazines were of the same character was not an admission they were obscene. His contention seems to have been that they were sufficiently like those for which his client previously had been convicted as to raise the possibility of prosecution, and thus to allow assertion of the Fifth Amendment privilege.

[18] In view of our disposition of this case upon other grounds we need not, and do not, decide whether the Fifth Amendment privilege actually encompasses these magazines.

On this record, with no state statute or rule guaranteeing a privilege or assuring that at a later criminal prosecution the compelled magazines would be inadmissible, it appears that there was no avenue other than assertion of the privilege, with the risk of contempt, that would have provided assurance of appellate review in advance of surrendering the magazines. We are satisfied that petitioner properly performed his duties as an advocate here, and he cannot suffer any penalty for performing such duties in good faith.[19]

*Reversed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE BLACKMUN joins, concurring in the result.

The Court today holds that the constitutional privilege against compulsory self-incrimination embraces the right of a testifying party to the unfettered advice of counsel in a civil proceeding. As the Court puts the matter, a "layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege. It is not a self-executing mechanism; it can be affirmatively waived, or lost by not asserting it in a timely fashion. . . . [I]f his lawyer may be punished for advice so given there is a genuine risk that a witness exposed to possible self-incrimination will not be advised of his right. Then the witness may be deprived of the opportunity to decide whether or not to assert the privilege." *Ante,* at 466–467.

---

[19] We recognize that there may be instances where advice to plead the Fifth Amendment could be given in bad faith, or could be patently frivolous or for purposes of delay, and such instances would present far different issues from those here. See *Cole* v. *United States,* 329 F. 2d 437 (CA9), cert. denied, 377 U. S. 954 (1964); *United States* v. *Cioffi,* 493 F. 2d 1111, 1119 (CA2), cert. denied, 419 U. S. 917 (1974).

The premise underlying the conclusion that the constitutional privilege against compulsory self-incrimination includes the right to the *unfettered* advice of counsel in civil proceedings must be that there is a constitutional right, also derived from the privilege against compulsory self-incrimination, to *some* advice of counsel concerning the privilege in the first place. The Court's rationale thus inexorably implies that counsel must be appointed for any indigent witness, whether or not he is a party, in any proceeding in which his testimony can be compelled. For surely few indigents will be more cognizant than was Maness' client of the privilege against compulsory self-incrimination, let alone aware of the "nuances" of the privilege. Unless counsel is appointed, these indigents will be deprived, just as surely as Maness' client would have been had he not been advised by Maness, of the opportunity to decide whether to assert their constitutional privilege. "To hold otherwise would deny the constitutional privilege against self-incrimination the means of its own implementation." *Ante,* at 468.

I am unwilling to go that far toward recognizing an unqualified right to appointed counsel in civil proceedings in a case that does not demand it. But I concur in the Court's judgment upon a wholly different ground.

More than 40 years ago the Court recognized a due process right to retained counsel in civil proceedings. "If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Powell* v. *Alabama,* 287 U. S. 45, 69. It requires no expansion of this well-established principle to hold that just as a state court may not arbitrarily prohibit retained counsel's presence in a courtroom, so too it may

not arbitrarily prohibit or punish good-faith advice given by retained counsel. The "right to be heard by counsel" is frustrated equally by denying the right to have counsel present during trial as by preventing counsel, once in the courtroom, from giving good-faith professional advice to his client.

The right to be advised by retained counsel in a civil proceeding does not, of course, guarantee a lawyer absolute immunity for advice he gives to his client. Whether a contempt citation constitutes an arbitrary interference with the constitutionally protected attorney-client relationship depends on both the tenor of the advice and the circumstances under which it is given. It does not depend solely on the nature of the legal issue involved. Advice to invoke a state-recognized testimonial privilege, for example, may be just as essential to the discharge of a lawyer's responsibility to his client as was Maness' advice to invoke the constitutional privilege against compulsory self-incrimination.

The Court's opinion and MR. JUSTICE WHITE's concurring opinion fully explain the circumstances that in this case justified Maness' advice to his client to refuse to comply with the trial judge's order to produce the subpoenaed material. Under these circumstances Maness did no more than properly perform the conventional service of a lawyer. To punish him for performing his professional duty in good faith would be an arbitrary interference with his client's right to the presence and advice of retained counsel—and thus a denial of due process of law.

MR. JUSTICE WHITE, concurring in the result.

The issue in this case is not simply whether a lawyer may be held in contempt for advising his client to plead the Fifth Amendment. Obviously, put that

way, he may not. The issue is whether, after his client's self-incrimination objection to testifying or complying with a subpoena is overruled and his client is ordered to answer, the lawyer is in contempt of court when he advises the client not to obey the court's order. I agree with the Court's judgment that the contempt judgment against the lawyer cannot stand in the circumstances of this case.

Although the proceeding in which he is called is not criminal, it is established that a witness may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him. The object of the Amendment "was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime." *Counselman* v. *Hitchcock,* 142 U. S. 547, 562 (1892); *McCarthy* v. *Arndstein,* 266 U. S. 34, 40 (1924); *Lefkowitz* v. *Turley,* 414 U. S. 70, 77 (1973). In any of these noncriminal contexts, therefore, "a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Id.,* at 78; *Kastigar* v. *United States,* 406 U. S. 441 (1972).

If the witness, having objected on Fifth Amendment grounds, is granted immunity against the use of his testimony and its fruits in a later prosecution, our cases hold that the danger of self-incrimination is removed and the privilege wholly satisfied. The purpose of the relevant part of the Fifth Amendment is to prevent compelled self-incrimination, not to protect private information. Testimony demanded of a witness may be very private indeed, but unless it is incriminating and protected by

the Amendment or unless protected by one of the evidentiary privileges, it must be disclosed. When the objection interposed is that of self-incrimination, a grant of immunity removes any ground for a refusal to answer and for a good-faith suggestion by counsel that the client not answer, however private his information may be. Should the attorney then advise his client not to answer, there should be no barrier to his conviction for contempt.

But what of the case, such as we have here, where the claim of privilege is overruled because the witness has not carried his burden of demonstrating to the satisfaction of the trial judge that the sought-after answer may incriminate him and there is apparently no occasion for an assurance of immunity? It seems to me that in such event the witness is nevertheless protected by a constitutionally imposed use immunity if he answers in response to the order and under threat of contempt. If, contrary to the expectations of the judge but consistent with the claim of the witness and his lawyer, the State later finds the answer or its fruits incriminating and offers either against the witness in a criminal prosecution, the witness has a valid objection to the evidence on the ground that he was coerced by a court order to reveal it and that it is therefore compelled self-incrimination barred from use by the Fifth Amendment.

In *Garrity* v. *New Jersey*, 385 U. S. 493 (1967), the State Attorney General summoned police officers to an inquiry into the fixing of traffic tickets. Following warnings that if they did not answer they would be removed from office and that anything they said might be used against them in a criminal proceeding, they were interrogated about the conduct of their official duties. No immunity of any kind was offered or available under state law. The questions were answered and the answers later used over their objections in a conspiracy prosecution of

the officers. The Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.,* at 500. *Lefkowitz* v. *Turley, supra,* reaffirmed this holding, 414 U. S., at 79–80, and declared that absent formal immunity protections, "if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution. *Bram* v. *United States,* [168 U. S. 532 (1897)]; *Boyd* v. *United States,* [116 U. S. 616 (1886)]." *Id.,* at 78.

Given this ultimate immunity from being incriminated by his responses to his interrogation, a refusal to answer should subject the witness to contempt without the necessity of appellate review extending to the merits of the Fifth Amendment claim. If the State makes sufficiently clear that it recognizes this established rule, the attorney would have no business advising his client to disobey the court's order to answer. But the possibility, much less the reality, of a compelled answer, along with its fruits, being immunized from later use was hardly brought home to this petitioner or to his client. Had the client been granted immunity or had he been advised of its functional equivalent—that although he was not immune from criminal prosecution with respect to the subject matter of his answers, neither his answer nor its fruits could later be used against him, *Kastigar* v. *United States, supra*—it may well have been that his choice, and the advice of petitioner, would have been quite different.

As the matter stands, nothing of the sort was clear in this case to either the petitioner or to his client. As far as can be ascertained from this record, the trial judge insisted that petitioner's client answer without any assur-

ance *then* that the forthcoming answers could not be used to convict him in the event that the judge was wrong about their not being incriminating. I therefore agree that it was error to hold the attorney in contempt for advising his client not to answer. Cf. *Lefkowitz* v. *Turley, supra;* *Gardner* v. *Broderick,* 392 U. S. 273 (1968); *Sanitation Men* v. *Sanitation Comm'r,* 392 U. S. 280 (1968). At the very least, if there were still a live controversy between the State and petitioner's client, which apparently there is not, the contempt judgment would be vacated and the client would be given another opportunity to answer, having in mind the controlling constitutional principles. *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 80 (1964).