

# IN THE
# TENTH COURT OF APPEALS

### No. 10-14-00179-CV

## IN THE MATTER OF THE MARRIAGE OF
## MELISSA MARIE CONE AND JOSHUA JOSEPH CONE
## AND IN THE INTEREST OF A.J.C., A CHILD

### From the 335th District Court
### Burleson County, Texas
### Trial Court No. 27,125

## MEMORANDUM OPINION

Joshua Cone filed for divorce from Melissa Cone in Harris County in September 2012, and a week later Melissa filed for divorce in Burleson County. On Melissa's motion, the Harris County court declined "jurisdiction" and transferred Joshua's case to Burleson County. Joshua then filed a counter-petition for divorce. The parties had married in December 2010 in Washington State, and they separated in July 2012. Each petition alleged insupportability of the marriage as the sole ground for divorce.

At a hearing on temporary orders in December 2012, the parties agreed to temporary orders providing for a psychological evaluation of each party, Joshua's one-hour weekly supervised visitation of their child A.J.C., and Joshua's payment of child

support at the minimum-wage rate because he was unemployed at the time.

The final hearing began on May 6, 2013. Melissa testified on direct about Joshua's alleged emotional abuse and his alleged infidelity during her pregnancy; she admitted to engaging in sexual improprieties but said it was to make Joshua happy and to save their marriage. Melissa made other allegations of wrongdoing by Joshua regarding his military service, and she also testified that he was controlling, that he had "pushed her," and that he was inattentive in caring for A.J.C. Melissa admitted to assaulting Joshua but said that the charges had been dismissed.

Before Joshua's attorney could begin cross-examination of Melissa, Joshua was arrested on a charge of "stalking" Melissa by his allegedly placing a tracking device on her car. He had already been arrested for the aggravated assault of Melissa in which she claimed that he had tried to run her car off of the road with a motorcycle.

The final hearing resumed on July 2, 2013. Melissa concluded her testimony on direct, repeating that Joshua had limited interest in helping in the care of their child as far as spending time with him, timely feeding him, and changing and bathing him. She also alleged neglect by Joshua in changing diapers, and she testified about an infected boil on the child's lower buttocks that allegedly occurred while the child was in Joshua's care. Melissa further alleged that Joshua once left A.J.C. alone in the bath.

Melissa testified that they met at a restaurant so that Joshua could see A.J.C., and after arguing, Joshua allegedly took A.J.C. and fled on foot into the nearby woods. The police were called and got Joshua to bring the child back after an hour. Joshua was charged with child endangerment. Additionally, Melissa alleged that Joshua used illegal

drugs, but she admitted to smoking marijuana with him one time after they had separated. She also admitted to other prior drug use with Joshua.

With regard to personal property, other than some unspecified tools, Melissa did not identify any separate or community property in Joshua's possession that she wanted. Her testimony did not place values on any personal property; she merely requested half of the value of the community personal property that was in Joshua's possession. Without identifying debts by financial institution, account, or amount, Melissa requested that the trial court order Joshua to pay all community debts.

On cross-examination, Melissa identified a photograph of her and another woman showering together while A.J.C. was asleep and Joshua was gone; Melissa admitted to sending a text that she and the woman were "getting drunk." Melissa also admitted to dropping off A.J.C. at the child-visitation location with a possible wet diaper at times, but she disagreed with the records showing that it occurred on multiple occasions. She explained that the wet diaper would have occurred during the forty-five minute drive to the location.

Melissa then presented testimony from her parents, from a family friend, and from the fiancé of Joshua's half-sister. Her father's criticism of Joshua was that he had seen Joshua "snap at her" one time in the process of moving. The family friend had visited the couple when they lived in Washington. He described Melissa as "isolated" at home and, although Joshua was "trying very hard," he thought it was to make a good impression. He did not have any safety concerns about the home.

Jacob Salinas, Joshua's first witness and his close friend, was presented out of order because he had travelled from out of state. Salinas had helped the couple move to Texas and spent a couple of weeks around Melissa during that time. He described Melissa as "insane" and suicidal. He observed Melissa scream at A.J.C. when he cried. After he and Joshua had returned from a shooting range, he witnessed Melissa grab a gun and make statements that she intended to shoot herself.

Joshua next presented, again out of order, the testimony of Dr. Roy Lupnitz, a psychologist who had evaluated Joshua and Melissa. Dr. Lupnitz said that Melissa's mental state showed a form of psychosis under stress and that she would not be thinking clearly. He refuted her claim of being controlled and isolated by Joshua, stating that she could be in more control if she wanted. Dr. Lupnitz also identified issues with Joshua as being impulsive and having grandiose opinions, but he did not make a recommendation that Joshua's possession be limited to supervised visitation.

Joshua then began his testimony. After providing some background information about himself, his military service, and the history of his relationship with Melissa, he sought to offer a recording on his cell phone of her making suicidal statements. While addressing the format of the exhibit that would be admitted, the trial court took yet another witness out of order to accommodate that witness's schedule. When Joshua's testimony resumed, he acknowledged the pending criminal charges and that, based on his criminal-defense attorney's advice, his intent not to testify about the facts on which those charges are based. Before any questions were asked about those charges, the trial court stated:

Now, … we are going to have a problem, because it's like the IRS lady; if you start talking, you don't get to pick and choose what you waive The Fifth on. So either he testifies or he doesn't.

And whether he wants to put himself out there to -- for the criminal part of this, that's a call y'all have to make. But it's not a pick-and-choose situation. You've asked her about the situation, and in all fairness, if you're going to call him, then he can't sit there and take The Fifth because I'm not going to allow it.

Even after Joshua made clear that he would not offer testimony on direct examination about the events leading to the criminal charges, Melissa's counsel expressed an intent to question Joshua about those very issues, and the trial court stated:

[E]ither you're testifying or you're not; make a decision.

….

But that is my viewing of the Fifth. We don't just pick and choose. It's an all-or-nothing thing.

Regarding Joshua's prospective decision to present no further testimony in light of the trial court's position that, if he did continue testifying, he could not invoke the Fifth Amendment, the trial court commented:

I don't know how you're going to tell me about your client if he doesn't testify. I don't know where he's living, I don't know what he's doing, I don't know where he's working.

Rather than electing to waive his Fifth Amendment right concerning the pending charges, Joshua rested without providing any further testimony, including the proffer of the recording where he was the only witness who could authenticate it. Regarding the recording, the trial court stated:

[T]he recordings aren't going to come in either because I didn't ask you if he was waiving - - if he was going to take the Fifth, because when he

came up here and testified, I assumed he would. But absent him as a sponsoring witness, they are not coming in.

The trial court subsequently issued a letter ruling that named Melissa as sole managing conservator of A.J.C. and made a division of the community property and debt. Joshua filed a Motion to Reconsider and Reopen Testimony, citing authority holding that the Fifth Amendment privilege must be asserted, and ruled upon, in response to specific questions. The trial court held a hearing on that motion December 9, 2013. It denied the motion but permitted an offer of proof.

In the offer of proof, Joshua testified about prior visitation arrangements, his current residence, and his request for at least standard visitation. The offer further authenticated the audio recording reflecting Melissa's alleged suicidal statements and included testimony about the separate property character of guns awarded to Melissa. When Joshua asserted his privilege to a specific question during cross-examination, the trial court sustained the privilege, contrary to the trial court's position at the final hearing.

The trial court then signed a final decree in conformity with the prior letter ruling. Joshua filed a motion for new trial and requested findings of fact and conclusions of law. The trial court denied the motion for new trial and made findings and conclusions.

In his appeal, Joshua's first issue asserts that the trial court erred in ruling that he would have to waive his Fifth Amendment privilege and testify about the pending criminal charges if he wanted to continue testifying about other issues in the case. We review a trial court's evidentiary ruling for an abuse of discretion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). A trial court abuses its discretion when it

misapplies the law to the established facts of the case. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex. 1991). "A trial court has no discretion to determine what the law is or in applying the law to the facts and, consequently, the trial court's failure to analyze or apply the law correctly is an abuse of discretion." *In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 483 (Tex. 2001).

The Fifth Amendment applies to testimony in civil suits. *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924); *see also Maness v. Meyers,* 419 U.S. 449, 464, 95 S.Ct. 584, 594, 42 L.Ed.2d 574, 587 (1975) (Fifth Amendment may be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory); *Burton v. West,* 749 S.W.2d 505, 507 (Tex. App.—Houston [1st Dist.] 1988, orig. proceeding) (defendant in drug proceeds forfeiture case permitted to assert Fifth Amendment to discovery); *Smith v. White,* 695 S.W.2d 295, 297 (Tex. App.—Houston [1st Dist.] 1985, orig. proceeding) (defendants under indictment entitled to assert Fifth Amendment rights in civil-custody dispute). The Fifth Amendment can be asserted in civil cases "'wherever the answer might tend to subject to criminal responsibility [he] who gives it.'" *Texas Dept. of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995) (quoting *McCarthy,* 266 U.S. at 40, 45 S.Ct. at 17).

In a criminal proceeding, any testimony at trial by the defendant waives the Fifth Amendment privilege. *Draper v. State,* 596 S.W.2d 855, 857 (Tex. Crim. App. 1980). But in a civil proceeding, the witness must assert the privilege in response to specific questions and the trial court must rule on each question individually. *Ex parte Butler*, 522

S.W.2d 196, 198 (Tex. 1975); *Gebhardt v. Gallardo*, 891 S.W.2d 327, 330 (Tex. App.—San Antonio 1995, no writ).

The United States Constitution limits "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Spevack v. Klein,* 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967)); *see also Davis–Lynch, Inc. v. Moreno,* 667 F.3d 539, 547 (5th Cir. 2012); *Alief ISD v. Perry*, 440 S.W.3d 228, 243 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). This requires a trial court to seek out ways to permit "as much testimony as possible to be presented in the civil litigation, despite the assertion of the privilege." *Davis-Lynch, Inc.*, 667 F.3d at 547. A party may not be forced to elect between assertion of the privilege and the loss of a civil suit. *United States v. White,* 589 F.2d 1283, 1286-87 (5th Cir. 1979).

We disagree with all of Melissa's arguments in support of the trial court's ruling. First, Melissa asserts that Joshua offered a blanket assertion of the Fifth Amendment privilege, which is not allowed in civil proceedings. *Gebhardt*, 891 S.W.2d at 330 (citing *White,* 589 F.2d at 1286-87 and *Meyer v. Tunks,* 360 S.W.2d 518, 523 (Tex. 1962)). The record plainly shows that Joshua never actually asserted his Fifth Amendment privilege in response to a question but that Joshua's criminal-defense attorney had advised him "not to testify about any of the things that [he] was under indictment for at this time." This was undoubtedly and merely an attempt by Joshua to inform the trial court and opposing counsel that he would be asserting his Fifth Amendment privilege about the things he was under indictment for, on both direct and cross-examination, and it was the trial court who ruled—erroneously—that Joshua would have to either make a blanket assertion of

the privilege or waive it if he wished to continue testifying at all. Plainly, the trial court was erroneously applying the Fifth Amendment invocation-rule for a defendant in a criminal case to Joshua's attempt to "not to testify about any of the things that [he] was under indictment for at this time."

Melissa next asserts that the trial court did not force Joshua to elect between waiving his Fifth Amendment privilege or not testifying any further. The above excerpts belie this assertion. The trial court's ruling could not have been clearer: "[I]f you start talking, you don't get to pick and choose what you waive The Fifth on. So either he testifies or he doesn't. … It's an all-or-nothing thing." In other words, if Joshua were to invoke the Fifth Amendment privilege on the two matters that he was under indictment for, the trial court was not going to allow him to testify any further, and if he chose to continue testifying, he would have to waive the Fifth Amendment privilege on the two matters that he was under indictment for. The trial court's ruling expressly forced Joshua to elect between waiving his right under the Fifth Amendment and not testifying further at trial, and this forced election impermissibly burdened Joshua's Fifth Amendment privilege. *See White,* 589 F.2d at 1286–87.

Melissa's third argument is that, apart from the trial court's refusal to allow Joshua's further testimony, Joshua could have but elected not to offer certain testimony. Melissa first points to Joshua's initial attempt to offer his cell-phone recording of Melissa's alleged suicidal statements. While addressing the format of the recording that would be admitted, the trial court took another witness out of order, and when Joshua's testimony resumed, the issue of his pending charges and the Fifth Amendment arose.

Then, after Joshua rested after electing not to testify further, his attorney raised the issue of offering the recording, but the trial court stated that "the recordings aren't going to come in either because I didn't ask you if he was waiving - - if he was going to take the Fifth, because when he came up here and testified, I assumed he would. But absent him as a sponsoring witness, they are not coming in."

Regarding Joshua's complaint about the property characterization of two guns that he asserts are his separate property because he got them from his father's estate, Melissa points out that Joshua could have testified to that issue during his initial testimony when he briefly testified about his background and his father's death and before the Fifth Amendment issue arose. But he also could have testified about the guns later had the trial court not forced him to elect between waiving his Fifth Amendment privilege and testifying at trial. Melissa further contends that Joshua did not list the guns on his inventory that was submitted post-trial. Regardless, each side's inventories were not admitted into evidence,[1] and there was no trial testimony about the property characterization of the two guns.

Melissa's final argument on this issue asserts that, had Joshua testified about the matters surrounding his pending charges, the trial court would have been justified in finding an offensive use of the Fifth Amendment privilege. This argument is speculative and, in any event, Joshua explicitly did not want to testify about those matters.

In conclusion, the trial court erred and abused its discretion in forcing Joshua to

---

[1] A filed inventory that is not admitted into evidence is not evidence. *Barnard v. Barnard,* 133 S.W.3d 782, 789 (Tex. App.—Fort Worth 2004, pet. denied).

elect between waiving his right under the Fifth Amendment and not testifying further at trial; this forced election impermissibly burdened Joshua's Fifth Amendment privilege.

If the trial court abuses its discretion in an evidentiary ruling, the complaining party must still show harm on appeal to obtain a reversal. *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009); TEX. R. APP. P. 44.2(a). Harmful error is error that "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a).

Joshua's testimony before the erroneous ruling was limited to his background and military service. Regarding Joshua's prospective decision to present no further testimony in light of the trial court's position that, if he did continue testifying, he could not invoke the Fifth Amendment, the trial court commented:

> I don't know how you're going to tell me about your client if he doesn't testify. I don't know where he's living, I don't know what he's doing, I don't know where he's working.

And in discussions after Joshua had rested without completing his testimony, the trial court further stated: "And since he doesn't testify, I don't know anything about his financials."

Joshua's limited testimony showed that he had objective evidence to support his testimony about Melissa's emotional condition and that she had threatened suicide. Although Joshua testified about Melissa's suicide threats, he elected to discontinue testifying before he was able to offer a recording of Melissa's statements, and the recording could not be authenticated by Joshua as a sponsoring witness. Joshua presented the recording in his post-trial offer of proof, and it arguably supports his testimony.

Furthermore, the erroneous ruling prevented Joshua from addressing the majority of Melissa's allegations that she made in her case-in-chief. The trial court's ruling also prevented Joshua from giving testimony on the characterization of property and debts. During trial the only testimony on the characterization of property came from Melissa, and the only specific property that she identified as in the possession of Joshua were tools from her car. She gave no testimony about guns, but the decree awarded two guns (a Ruger handgun and a 40 mm handgun) to Melissa. Joshua's offer of proof was the only evidence on the character of the firearms; he testified that both guns had belonged to his father and that his mother was letting him use one and that he bought the other from his father's estate with funds he was given from his father's estate. *See* TEX. FAM. CODE ANN. § 3.001(2) (West 2006) (providing that property acquired by spouse during marriage by gift, devise, or descent is separate property). A court has no authority to award the separate personal property of one spouse to the other, and it is reversible error to do so because it unconstitutionally divests a party of separate property. *Cameron v. Cameron*, 641 S.W.2d 210, 220 (Tex. 1982) (citing TEX. CONST. art. 16, § 15); *Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex. 1977) (same). The trial court's erroneous ruling thus caused reversible error in the character and division of property.

In conclusion, the trial court's erroneous ruling probably caused the rendition of an improper judgment. Accordingly, we sustain Joshua's first issue. We affirm that part of the trial court's final decree that grants a divorce, but we reverse the decree in part on all other issues: conservatorship, possession and access, and child support; and division

of the marital estate.  Because of this disposition, we need not address issues two and

three.  This case is remanded for further proceedings consistent with this opinion.



REX D. DAVIS
Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed in part, reversed in part, and remanded
Opinion delivered and filed April 28, 2016
[CV06]

