Nicholas BACHYNSKY and Physician's Clinic of Dallas, Inc., Appellants,

v.

The STATE of Texas, Appellee.

No. 05–86–00959–CV.

Court of Appeals of Texas, Dallas.

Feb. 11, 1988.

Rehearing Denied March 22, 1988.

Thomas R. Newman, Texarkana, for appellants.

Stephen Gardner, Eliot D. Shavin, Dallas, for appellee.

Before DEVANY, STEWART and HECHT, JJ.

HECHT, Justice.

Dr. Nicholas Bachynsky and the Physician's Clinic of Dallas, Inc. ("the Clinic") appeal from the district court's assessment against each of them of the maximum $50,000 civil penalty authorized by the Texas Deceptive Trade Practices—Consumer Protection Act[1] for 106 separate violations of a permanent injunction issued under that Act. We hold that the district court's findings of so many violations are based upon a misconstruction of the injunction. Viewing the record in light of a proper reading of the injunction, indulging every inference in favor of the State, we find evidence of at most only a fraction of the violations found by the district court against the Clinic. We find no evidence that Bachynsky violated the injunction individually. Consequently, we reverse the judgment, render judgment in favor of Bachynsky, and remand the case as to the Clinic for further proceedings.

## I

This case in the district court has involved two separate proceedings. The first, which we call the injunction proceeding, is the subject of a separate appeal. See *Bachynsky v. State*, 747 S.W.2d 868 (Tex.App.—Dallas 1988). The present appeal is from the judgment rendered in the second proceeding, which we call the enforcement proceeding.

In the injunction proceeding, the State sued Bachynsky, the Clinic, and four other affiliated clinics in Houston and San Antonio, for violations of the DTPA.[2] The State claimed that Bachynsky and the clinics violated the DTPA in two ways:

Representing that goods or services have characteristics, uses, or benefits which they do not have, by representing that Dinitrophenol is a safe and appropriate drug for use in a weight-loss program.

---

1. Tex.Bus. & Comm.Code Ann. §§ 17.41–17.63 (Vernon Supp.1987 ("DTPA"). Specifically, the injunction was issued and penalties were assessed under section 17.47 of the DTPA.

2. Specifically, the State brought suit under section 17.47, apparently for violations of sections 17.46(b)(5) and (23). The State also sued for violations of the Texas Food, Drug and Cosmetic Act, Tex.Rev.Civ.Stat.Ann. art. 4476–5 (Vernon Supp.1987), and for negligence.

Failing to disclose information concerning goods or services which was known at the time of the transaction where such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed, by failing to advise patients that Dinitrophenol is a highly toxic substance, that it should not be used in a weight-loss program, and that there is no known accepted medical use for the drug.

After a lengthy trial, the jury returned a verdict in the State's favor, upon which the district court rendered judgment. That portion of the judgment at issue here states:

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that all Defendants [Bachynsky and the five clinics], their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this injunction by personal service or otherwise, are hereby permanently enjoined from engaging in the following acts and practices:

.     .     .     .     .

5. Advertising for or otherwise soliciting patients with the intent or promise of prescribing, dispensing or otherwise distributing DNP to patients.

6. Representing that DNP is a safe drug for use in a weight-loss program.

7. Failing to advise patients or prospective patients that DNP is not generally recognized as safe in the treatment of obesity, that it is a highly toxic substance, that it is not approved by the Food and Drug Administration, and that it is a herbicide.

Less than a month after this injunction issued, an investigator working for the Attorney General telephoned the Clinic and spoke with an employee there. Based upon that conversation, the State filed a petition for civil penalties against Bachynsky and the Clinic for alleged violations of the injunction.

## II

■ At the outset, Bachynsky and the Clinic contend that the injunction cannot be enforced against them because it is too vague and overbroad, because it does not state the specific reasons for its issuance as required by Texas Rule of Civil Procedure 683, and because it infringes upon their free speech rights protected by the First Amendment to the United States Constitution. We need not address any of these arguments because we hold that this case falls within the rule that parties must obey even invalid court orders until they are overturned on appeal.

Generally, no one is free to disobey an invalid court order until the order has been overturned on appeal. *See Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *United States v. Leyva*, 513 F.2d 774, 776 (5th Cir.1975); *Ex parte Fernandez*, 645 S.W.2d 636, 638 (Tex.App.—El Paso 1983, no writ). This rule "applies even where the invalidity of the order is of constitutional proportions." *United States v. Dickinson*, 465 F.2d 496, 509 (5th Cir. 1972), *cert. denied*, 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223 (1973).

The State acknowledges two exceptions to this rule. First, an injunction cannot be enforced if it is void *ab initio*, such as one issued without a bond, *Lancaster v. Lancaster*, 155 Tex. 528, 291 S.W.2d 303, 308 (1956), or one issued by a court without jurisdiction, *Ex Parte Richards*, 137 Tex. 520, 155 S.W.2d 597 (1941). Second, a finding of civil contempt cannot be premised upon an invalid order. *In re Timmons*, 607 F.2d 120, 124 (5th Cir.1979).

■ This case does not fall within either exception to the general rule. There is no contention that the district court lacked jurisdiction. The only violation of any rule of procedure asserted is that the injunction does not state the specific reasons for its issuance in violation of Texas Rule of Civil Procedure 683.[3] Assuming that such a vio-

---

3. Rule 683 states in part: "Every order granting an injunction ... shall set forth the reasons for

lation would fall within the first exception, an issue we do not decide, we nevertheless conclude that the injunction in this case properly states the specific reasons for its issuance to be the violations of the DTPA and the Texas Food, Drug and Cosmetic Act found by the jury in their verdict referenced in the injunction. Furthermore, this action for civil penalties under the DTPA is more akin to a criminal contempt proceeding than a civil contempt proceeding because the sanctions imposed are penal and unconditional.

The injunction was effective and binding upon Bachynsky and the Clinic at the time of the violations found by the district court.[4] Bachynsky and the Clinic were obliged to obey it until set aside on appeal. Their complaints as to its validity cannot be heard in defense of this enforcement proceeding.[5]

### III

Bachynsky and the Clinic contend that the evidence is legally and factually insufficient to support the district court's findings of 106 violations of the injunction. They also contend that the district court erred as a matter of law in concluding that penalties should be assessed against them. Before turning to these arguments, it is important to examine the injunction carefully.

### A

Two features of this injunction are crucial to the issues in this case. First, although the language of the injunction is prohibitory only, the effect is both prohibitory and mandatory. Paragraphs 5 and 6 prohibit "advertising", "soliciting" and "representing", all assertive conduct. Paragraph 7 prohibits "failing to advise", omissive conduct. By prohibiting "failing

to advise", the injunction in effect mandates advising. Paragraph 7 thus requires that all patients and prospective patients of Bachynsky and the clinics be told four things: that DNP is (1) not safe, (2) toxic, (3) not FDA–approved, and (4) a herbicide.

Second, it is important to note that only Bachynsky and the five affiliated clinics are parties to this action. Their "officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this injunction by personal service or otherwise," are not parties to the case. The injunction constrains this additional group of people by authority of Texas Rule of Civil Procedure 683, but only in their various capacities as associates of the parties to the case, and not as individuals.

There is little difficulty with enforcement of the prohibitions of the injunction. Quite clearly, paragraphs 5 and 6 of the injunction are violated if Bachynsky, or any clinic, or any specified associate of any of them takes the prohibited action. For example, if any employee of any clinic solicits patients intending to give them DNP, that solicitation is a violation by that[6] clinic. Also, if any employee of any clinic represents that DNP is a safe drug for use in a weight-loss program, and makes that representation as an employee rather than as an individual, that representation is a violation by that clinic.

There is considerable difficulty, however, in attempting to enforce the mandates of paragraph 7 in the same manner as the prohibitions of paragraphs 5 and 6. The difficulty is posed by this question: does the injunction require every employee of a clinic to each advise every patient or prospective patient of that[7] clinic of the four

its issuance...."

4. The propriety of the injunction is now pending before us. See *Bachynsky v. State,* 747 S.W.2d 868 (Tex.App.—Dallas 1988).

5. Appellants' third point of error is overruled.

6. Of course, one clinic could not be sanctioned for a violation by another clinic's employees acting independently unless the two clinics were "in active concert or participation with them".

In other words, the judgment enjoins *each* defendant and his or its respective associates, as if a separate injunction were issued against each defendant.

7. Although the injunction is not entirely clear, it seems obvious that it does not require one clinic and its associates to advise the patients an prospective patients of another clinic. It would clearly be impossible for employees of the Dallas Clinic to give patients of the Houston and San Antonio clinics the prescribed warnings.

warnings, or does the injunction require only that every such patient or prospective patient be advised by some employee? Whatever doubt the language of the injunction leaves as to the answer to this question, the purpose and effect of the injunction remove.

If the injunction were construed to require every person covered by it to perform the mandate of paragraph 7, compliance would be practically impossible. For example, that construction would require the attorney for the Clinic to search out not only every patient but every prospective patient of his client and tell them himself what the injunction says they must hear. He would share the same responsibility with every other employee and associate of the Clinic. Any failure by any associate would violate the injunction, even if every other associate discharged his responsibility.

This construction is unnecessary to provide the State full remedy for the alleged statutory violations. The State alleged, not that every employee of the clinics was failing to say something he should have, but rather, that patients and prospective patients were not being given material information. The alleged wrong is fully remedied by ordering that patients and prospective patients be told. Ordering that every single person associated with Bachynsky and the clinics each do the telling would be to impose an unnecessary burden on Bachynsky and the clinics.

The State and the district court tacitly assume this impossible and unnecessary construction of the injunction; that is, they assume without ever saying so that a single employee's failure to offer patients and prospective patients the advice that paragraph 7 requires to be given violates the injunction. What they overlook is that paragraph 7 is not violated as long as *someone* constrained by the injunction renders the mandated advice. The State cannot prove a violation of paragraph 7 simply by producing an employee of the Clinic who failed to give the required warnings to patients and prospective patients. The State can prove a violation of paragraph 7

only by producing a patient or prospective patient of Bachynsky or the clinics who has not been told by anyone associated with them that DNP is not safe, is not approved by the FDA, and is a toxic herbicide. The 106 violations found by the district court rest on this misconstruction of the injunction.

### B

The record of this enforcement proceeding is very brief. Only three witnesses testified. The first, an investigator for the Attorney General, sponsored an audiotape recording of her telephone conversation with an employee of the Clinic, Geri Levine. Levine was then called to testify about that conversation and about her dealings with patients of the Clinic generally. Finally, Bachynsky testified about what steps he had taken to ensure that Clinic employees complied with the injunction.

The only violations of the injunction asserted by the State are alleged to have been committed by Levine. Levine described her job as telemarketing, handling incoming calls about the Clinic. Levine was not the only employee of the Clinic, nor the only one to answer the phone, nor the only one who talked with patients and prospective patients.

The district court found that Levine violated paragraph 6 of the injunction at least 6 times, paragraph 7 at least 50 times, and paragraph 5 at least 50 times, for a total of 106 separate violations. The district court further found that Levine was also employed by Bachynsky, and that Bachynsky was the alter ego of the Clinic. We examine each finding in turn to show that there is no evidence from which the district court could have found the number of violations it did.

### 1

The district court found that Levine violated paragraph 6 of the injunction as follows:

By representing to persons who telephoned and visited Physician's Clinic of Dallas, Inc. that DNP was a safe drug for use in a weight-loss program. The

Court finds that Geri Levine made these representations on at least six different occasions.

There is clear evidence of one violation of paragraph 6. Levine made the following statement in a telephone conversation with an investigator for the Attorney General posing as a prospective patient:

[Investigator]: Is it [DNP] safe?

[Levine]: Oh yes, highly, everybody here took it, and the people who are patients, who were taking it and that sort of thing, were sick, but they could not take it anymore, Okay? It's one of these medications that people really get spoiled on and the reason they do is because it raises your body temperature a degree and by doing so you burn off these calories, Okay? And you just didn't have to watch your diet that much.

As for any other violations of paragraph 6, the entire evidence is as follows:

Q [By the State's attorney]: Now, between April 10, 1986 and May 19 when you received a copy of the injunction, did you discuss dinitrophenol with several people that called on the telephone; is that right?

A [Geri Levine]: Can you tell me what you mean by several?

Q You talked with more than one person about dinitrophenol, is that correct?

A That is correct.

Q At your deposition you said four, five or six. Is that the approximate range?

A I said two or three or four or six. I wasn't sure.

Q Your testimony now, it could have been as few as two or as many as six?

A Possibly. I don't keep track of it.

Q You talked to more than one person, is that correct?

A That is correct.

Q What did you tell them when they called in?

A Well, unless they specifically asked about dinitrophenol, I talked to them about coming in the clinic and taking a look at what the product that we now were proposing or what we were using now, based on radio advertisement.

Q My question was discussions of dinitrophenol with people. I assume you talked to more than two or six people in the entire time between April 10 and May 19, 1986; is that right?

A Yes, sir.

Q Your response of two to six people that you talked to about dinitrophenol, is that right?

A I am sorry. I don't understand what you are saying.

Q You earlier said you talked to as few as two or as many as six. I presumed you were answering my question. How many people did you talk to about dinitrophenol? I need to clarify that. You're saying two to six people that you talked to about dinitrophenol, is that right?

A Possibly. I really don't know the number of people that I talked to about dinitrophenol. If they called in and specifically asked me about dinitrophenol, I did respond in some way. Is that what you are asking me, how I responded?

Q To those people, what you told them.

A What I would tell them, first of all, preempt that by saying if they called in and said I understand that and I would like some information on dinitrophenol, I would normally state that we are no longer dispensing dinitrophenol; that we are now using a different product, and that was due to the fact that the Court said we cannot—no longer dispense that.

If they called in, on the other hand, and made a derrogatory [sic] statement toward dinitrophenol, and in a position—put in a position to have to defend the product, then I would go ahead and state, no, we weren't dispensing dinitrophenol any longer but that I felt like there was not anything wrong with dinitrophenol.

Q You would tell them it was safe?

A I would tell them, as far as I was concerned, it was safe, yes.

.        .        .        .        .

Q [By appellants' attorney]: You indicated in your testimony with [the State's attorney] that you discussed the safety of this product. Do I understand your testimony that you discussed the safety of the product only in the context of you?

A That I had not had a problem with it.

Q As far as I am concerned, it is safe, is that the testimony that you gave to Mr. Gardner?

A That is correct.

Q During that conversation that you had with these people from the time that the trial was over with, up until the time that you received this judgment, did you ever express in terms of other than you, that other people felt this drug was safe or did you just discuss it in terms of yourself?

A I was expressing my opinion.

To summarize, Levine testified that she talked with more than one person about DNP but was not sure exactly how many. Levine never actually stated that she talked with as many as six people about DNP. Furthermore, Levine testified that whenever she told a caller that DNP was safe she was expressing her own personal opinion and not her opinion as an employee of the Clinic. However, it perhaps could be inferred from the fact that she was talking to callers as an employee of the Clinic that she was speaking as an employee, despite her testimony to the contrary.

We cannot say that there is no evidence to support the district court's finding that Levine violated paragraph 6 of the injunction at least six times. There is clear evidence that she violated paragraph 6 once, and some evidence, though scarcely more than a scintilla, that she violated paragraph 6 as many as seven times.

■■■■ There is, however, insufficient evidence from which to find that Levine violated paragraph 6 more than the one time in her conversation with the investigator. Fact findings that shock the conscience, or are manifestly unjust, or clearly demonstrate bias or prejudice are against the great weight and preponderance of the evidence. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The extent to which the district court reached to find violations of the injunction here is troublesome, as is the following colloquy during these proceedings:

Q [By the State's attorney]: So you didn't need to comply with the other provision [of the injunction], is that what you are saying?

A [Nicholas Bachynsky]: I thought we automatically complied with it when everybody was informed we are not going to use DNP, not promising to use DNP in the future, not one patient was enrolled into any type of program that had anything to do with—

THE COURT: Sir, just answer the question.

THE WITNESS: What was the question again?

Q Doctor, I'll rephrase. Are you saying that because you complied with paragraph 1, on page 3 of the judgment, that there was no need to worry about complying with the other provisions; therefore, you did not tell people, your people about the provisions?

A My feeling was that—

THE COURT: Just answer the question.

Q Just yes or no.

[Appellants' attorney]: He can't answer it yes or no. He is trying to answer as best he can.

THE COURT: He can answer the question, sir. *The court is acquainted with this witness.* The witness can answer the question. The reporter will read the question to the witness.

[Whereupon the aforementioned question was read back aloud by the Court Reporter.]

Q Do you understand the question?

THE COURT: I would rephrase that question.

(Emphasis added.) The district judge's repeated direction to the witness to answer a question he later directed to be rephrased,

coupled with his statement that he was acquainted with Dr. Bachynsky, casts doubt upon the fairness of the findings made on this record to justify assessment of the maximum penalty.

2

The district court found that Levine violated paragraph 7 of the injunction as follows:

> Geri Levine failed to advise patients and prospective patients that DNP is not generally recognized as safe in the treatment of obesity, that it is a highly toxic substance, and that it is a herbicide, when discussing DNP with persons who telephoned or visited Physician's Clinic of Dallas, Inc. The Court further finds that Geri Levine failed to advise patients and prospective patients of these facts on at least 50 separate occasions involving at least 50 different individuals.

The entire testimony in support of this finding is as follows:

"Q [By the State's attorney]: When you discussed dinitrophenol during that period, April 10 through May 19, or thereabouts, did you tell people that dinitrophenol is not generally recognizably safe in the treatment of obesity?

"A [Geri Levine]: No.

"Q Did you tell them that it was a highly toxic substance?

". . .

"A No, I did not.

"Q Did you tell them that it is a herbicide?

"A No, I did not.

"Q Now, you said you did talk about dinitrophenol to people that were derrogatory [sic] of it?

"A Yes.

"Q These people, did you view them as prospective patients or current patients of the clinic?

"A Just responded to their statement one way or the other.

"Q You didn't—

"A A defense mechanism, defending a product. I didn't think there was anything wrong with it.

". . .

"Q Mrs. Levine, I presume you got supportive calls for dinitrophenol?

"A. That is correct.

"Q During that same period of time after the judgment was signed and before you got the copy of the judgment on May 19?

"A Yes, sir.

"Q Yes?

"A Yes.

"Q How many?

"A I have no idea.

"Q Can you give me just a ballpark figure?

"A Several. I don't have any idea how many supporting calls we got. We had people coming in the clinic all the time that were very supportive; so I didn't keep numbers on that.

"Q Are we talking about hundreds?

"A I have no idea. I can venture a guess it would not be—

"Q Just qualify as a guess and give me a rough idea.

"A I would suppose 50, 60, something in that neighborhood.

"Q People that you actually talked to in person or on the telephone?

"A That is correct.

"Q And you talked about the trial or about dinitrophenol with them?

"A Well, we didn't really talk about the trial so much as just that they wanted us—were hoping that the case would go the other way, because the product was working for them.

"Q The product was dinitrophenol?

"A That is correct.

"Q When you were talking to those people, did you tell them that dinitrophenol was not generally recognized as safe for the treatment of obesity?

"A   Well, the—you're getting to an area that I really had not much to do with, but all our patients that were on dinitrophenol, a little bit of it, I know, they were on dinitrophenol when they went in to talk to the director.

"Q   I am asking what you told them.

"A   What I told them when?

"Q   When you—did you tell them dinitrophenol is not generally recognized as safe in the treatment of obesity or words to that effect?   You didn't, right?

"A   I didn't.

"Q   And you didn't tell them that it was a highly toxic substance?

"A   They were already aware of that.

"Q   Did you tell them that?

"A   No.   I didn't have to.

"Q   Did you tell them that it was a herbicide?

"A   Again, I didn't have to.

"Q   I am going to ask you if you will, just so we don't prolong the hearing, to answer my question.   If you can answer it yes or no, give me a straight answer, please.

"A   Okay.   If I can.

"Q   Well, I am going to ask you that again.   Did you tell them that it was a herbicide?

"A   No, I did not.

"   . . .

"Q   Miss Levine, you continued working for Physician's Clinic for about a day or so following the deposition, is that right?

"A   No, sir.   Actually, I worked for them for about two weeks after the deposition.

"Q   I have written down that you quit on May 30.   Is that wrong?

"A   Correct.   I am sorry.   When did I get the deposition?

"Q   The deposition is dated May 29, 1986; so about mid–June?

"A   I am sorry.   Yes, that is correct.

"Q   So you worked for them about— about four weeks after the point when you actually did get a copy of the written injunction contained in the judgment, is that right?

"A   The injunction was sent May 19, is that right?

"Q   Yes, ma'am.

"A   Okay.   So actually I worked for them two weeks.   I did leave Bachynsky's employment the end of May, May 30. You're correct, a day or two after the deposition.

"Q   In that period when you got telephone calls, what did you tell them about dinitrophenol?

"A   That we could no longer—no longer dispensing and we weren't allowed to discuss it over the phone.

"Q   And if a caller asked you further questions about dinitrophenol what did you tell them?

"A   I just told them that we weren't allowed to discuss it.

"Q   Did you get calls to that effect in that period?

"A   Only one.

"Q   Only one?

"A   Yes.

"Q   When you got that call, did you tell that caller that dinitrophenol was not generally recognized as safe for the treatment of obesity?

"   . . .

"A   No, because I told them we weren't allowed to discuss it.

"Q   Did you tell them that it was a highly toxic substance?

"   . . .

"A   No.

"Q   Did you tell that caller that it was a herbicide?

"A   No.

"   . . .

"Q   [By appellants' attorney]: Do I understand then, Mrs. Levine, that from May 19, 1986, until May 30, 1986, that that is the only time that you continued to work for Dr. Bachynsky or for the clinic in Dallas?

"A That is correct.

"Q During that period of time, during those eleven days, or however long, working days from May 19 to May 30, how many callers called you inquiring about DNP?

"A One.

"Q And what did you tell that caller?

"A I told them that we were not allowed to discuss dinitrophenol over the phone, were not allowed to discuss it.

"Q Did you cut the conversation immediately off after you told them that?

"A I told them that as far as I can remember. I told them that we were using the new product and that I would be happy to set them up an appointment to come in and discuss that new product.

"Q And as to even discussing or even dispensing DNP on that one phone call, you did not even do that.

"A No, I did not.

"Q And was that as per instructions from Dr. Bachynsky's attorney?

"A And Dr. Bachynsky, yes.

"...

"Q As to these individuals that had been taking DNP, had you discussed that with those patients?

"A No.

"Q You indicated in your earlier testimony that those patients knew that that drug was a highly toxic drug. How do you know that they knew that?

"A They had to sign a waiver before going on the medication."

■ To summarize, Levine testified that she guessed she might have talked with fifty or sixty people about DNP after the injunction was issued. She did not testify that she considered such people to be patients or prospective patients, although the district court might have inferred that they

were from the fact they were calling. Levine did not give any of these people the warnings required by paragraph 7.

Interestingly, Levine did tell the Attorney General investigator that DNP was not approved by the FDA[8] and was a pesticide,[9] as opposed to a herbicide. Although Levine did not give the investigator the other two warnings required by paragraph 7, there is no evidence that the investigator was a patient or prospective patient of the Clinic.

Indulging every inference in favor of the State, there is no evidence whatever that any patient or prospective patient of Bachynsky or the Clinic was not given the warnings required by paragraph 7 of the injunction. Levine was not the only employee of the Clinic, nor is there any evidence that she was the only Clinic employee to talk with patients and prospective patients. The record reflects that the Clinic employed a staff including a director, counselors and Levine's supervisor. The State has not identified a single patient or prospective patient of Bachynsky or the Clinic who was not told by someone associated with them that DNP is an unsafe, non-approved, toxic herbicide. The existence of such a person cannot be inferred from anything in the record. To the contrary, Levine testified that the patients she talked with were already aware of these facts.

There is therefore no evidence of the 50 violations of paragraph 7 of the injunction found by the district court, nor indeed of any violation.

### 3

■ The district court found that Levine violated paragraph 5 of the injunction as follows:

That Geri Levine solicited patients with the intent of prescribing, dispensing or

8. Levine told the investigator: "If you've been in Dallas anytime at all Physician's Clinic was in a lawsuit over this medication [DNP] that we were using because it is not FDA approved."

9. Levine told the investigator, "So any drug that has been used and tested before the FDA came into being, it did not have to have FDA approval because it had a pesticide in it, which, we knew that, you signed an agreement that you were aware of that, that was what all the hullaballoo [sic] was all about."

otherwise distributing DNP to patients in the future, by discussing DNP with persons who telephoned or visited Physician's Clinic of Dallas, Inc. The Court further finds that this action was taken with the intention of defending Dinitrophenol, defending Dr. Nicholas Bachynsky, and defending Physician's Clinic of Dallas, Inc., and also with the intention of preserving Defendants' potential market for sales of DNP in the future. The Court further finds that these actions were taken by Geri Levine on at least 50 separate occasions involving at least 50 different individuals.

The entire testimony in support of this finding is as follows:

"Q [By the State's attorney]: You earlier said that you were defensive on this. It is correct, is it not, that at the time that you were working there you wanted to defend the clinic?

"A If it needed defending.

"Q And defend Dr. Bachynsky?

"A Correct.

"Q And, for that matter, dinitrophenol?

"A If it needed defending. In this case it did.

"Q The cases when you felt they were being derrogatory [sic]?

"A Correct.

"Q And one of the reasons you wanted to defend it was in case you were able to use it in the future; isn't that right?

"A Will [sic], initially whenever I would defend it it was because of the fact that I felt like it had gotten a lot of negative press. A lot of people were happy with the product, and if someone called in a negative sense, I felt the need to defend it.

"Q That is part of it also, because you might be using it in the future, is that correct?

"A I suppose. I guess not. I don't know. I don't think that it was a matter of trying to set something up so we could use it in the future, was my motivation behind it.

" . . .

"Q Do you remember when you came to my office and gave your deposition on May 29, 1986?

"A Yes.

"Q . . . I am going to read from it and ask you to read the answers that you gave. I want to see if that is still your answers today.

QUESTION: I guess if you were going to use it again you would want people to get, keep a good opinion of it, is that right.

And your answer was.

ANSWER: Yes.

"A Well, you mean if I personally was going to use it again?

"Q No, if the clinics were going to be using it again, you would want to make sure that the patients or prospective patients thought in your opinion it was safe?

"A If we were going to use it again.

"Q Is that a yes?

"A Yes.

"Q So at your deposition you told me that that was at least part of your motivation, in case you could use it again, you want it to be defended?

" . . .

"A Yes.

"Q Is that still your testimony today, that one of the reasons, one of the motivations for your defending dinitrophenol was that it might be used again in the future?

"A Yes.

" . . .

"Q [By appellants' attorney]: Let me go back then. From April 10 of 1986 until May 19, did, to the best of your knowledge, a clinic in Dallas, Physician's Clinic of Dallas, Inc., did they ever sign up one patient and use DNP on that patient?

"A No, they did not.

" . . .

"Q What did you do immediately after being made aware of the judgment?

"A We gathered up all the dinitrophenol and one of the gentlemen that was

from our Houston office took it with him, I assume, back to the clinic.

"Q Was that the day of the judgment?

"A That was the day the trial was over with, yes.

"Q I am sorry. What else was—what else did you do at the clinic other than the medication being picked up and taken back to Houston?

"A We gathered up all the brochures and information and threw those away.

"...

"Q Have you read the testimony that was attached to the petition for penalties as to why we are here today? Have you read the transcription of your testimony? [This question apparently refers to the transcript of Levine's telephone conversation with the Attorney General investigator.]

"A I have read the transcription of my testimony, yes.

"Q At any time during that phone call, was it your intent to sell DNP to this person?

"A I am sorry. Say that again.

"Q At any time during this phone conversation, was it your intent, your desire to sell DNP to this patient?

"A Absolutely not.

"Q Were the comments that you made strictly defensive as per their questions?

"A Correct.

"Q Were you merely responding to allegations or inquiries about DNP?

"A Correct.

"...

"Q Why did you inform this person about norkamine at that time?

"A Well, that is one of the products that—one that I am familiar with because I was taking it myself; that we were dispensing instead of dinitrophenol.

"Q At any time during that conversation with this person was it your intent or were you instructed by anybody from the clinic to talk about DNP to keep it in the minds of people that were calling?

"A Absolutely not.

"Q Were you instructed by anybody to do that?

"A No.

"Q Did you do that to any of these people that you might have talked to from the date of the judgment, the date of the trial being over with, until you received this judgment on May 19?

"A No.

"Q Did Dr. Bachynsky or anybody in the clinic at Physician's Clinic of Dallas, Inc., from the time that the trial was over with until you received the copy of the judgment on May 19, 1986, did anybody at that clinic, your supervisor or Dr. Bachynsky, instruct you to keep DNP in the minds of anybody that might be calling?

"A No.

"Q So they might have future sales prospects?

"A No, sir.

"Q Did you at any time do that to maintain future sales prospects?

"A No, sir.

"Q Did you understand—what did you understand that you could say about DNP after this trial was over with?

"A The only—to answer that, the only time we felt the need to even discuss dinitrophenol was if someone called in and made a statement, derogatory statement about it or statement about it.

" I didn't realize—think anyone in our office realized that we were even limited in conversation; that we were not even able to discuss it in conversation.

"...

"Q Mrs. Levine, concerning those two to six individuals that you indicated to Mr. Gardner talked to you from the time that decision was rendered by the jury, and up until you received this judgment on May 19, concerning those two to six folks that you discussed DNP with, to the best of your knowledge was there any information, such as brochures, any type of literature sent to those people to enable them to keep DNP in their minds in the event that at

some future point DNP might again be utilized by Dr. Bachynsky?

"A  No.

"Q  Is that unequivocal?

"A  No, absolutely not.

"...

"Q  To the best of your knowledge as telemarketer there at Physician's Clinic of Dallas, Inc., to the best of your knowledge was there anything done to promote DNP after the jury came back and before you received this judgment?

"...

"A  No."

To summarize, the only evidence that Levine solicited patients with the intent of dispensing DNP to them in the future was that she felt the need to defend DNP from derogatory remarks, and that she was motivated to do so in part to help people keep a good opinion of DNP *if* it could ever be used again. There is no evidence that Levine ever solicited a single patient with any hope or promise of using DNP, and no such solicitation can be inferred. To the contrary, Levine made quite clear in her conversation with the Attorney General investigator, despite the latter's repeated baiting, that she could not obtain or even use DNP:

[Investigator]: I see, but I can't get it [DNP] now?

[Levine]: Correct, not that one. What we are using though now, it was so easy with Dinitrophenol because, what we could do, it worked for everyone.

[Investigator]: Before you tell me about that [alternative drug], is there anyone else prescribing it [DNP]?

[Levine]: No.

.  .  .  .  .

[Investigator]: I guess I shouldn't go try to raid my friend's medicine cabinet and see if she has any more [DNP].

[Levine]: No. The thing is that you have to go through certain testing, a physical and things like that with us before we can ever put you on, I don't care if it's Dinitrophenol, I don't care what it is, Okay? This is a medical clinic, they

need to make sure that you don't have any problems we need to be aware of and the medication that you'd take, how much you need to take. Some people can take only 1 a day, some take 2, some take 3, it all needs to be controlled by the Doctor.

[Investigator]: Well, I'm very disappointed about the, I'd like to come in. Oh let me ask, can you give me an idea how much the program costs?

[Levine]: That I don't know. I would say probably, I don't know if it's the same, if it's less, more, whatever. It's based on the amount of medical services required.

.  .  .  .  .

[Investigator]: Well that gives me an idea anyway. Well I'm really disappointed I can't get the original drug anymore.

There is therefore no evidence of any violation of paragraph 7 of the injunction. The finding that Levine acted defensively is completely irrelevant to the issue of whether she violated the injunction.

## C

The district court concluded that Bachynsky violated the injunction through the conduct of Levine, based upon two findings: first, that Levine was employed not only by the Clinic, as she testified, but by Bachynsky himself; and second, that the Clinic was Bachynsky's alter ego.

## 1

■ The State apparently concedes that there is no evidence to support the district court's finding that Levine was employed by Bachynsky individually. Actually, the evidence is as follows:

"Q  [By the State's attorney]: You used to work for Physician's Clinic here in Dallas, is that correct?

"A  [Levine] Yes, sir.

"Q  When did you start there?

"A  In March of 1985.

"Q And you have since terminated your employment there?

"A That is correct.

"Q When was that?

"A May 30, 1986.

" . . .

"Q Miss Levine, you continued working for Physician's Clinic for about a day or so following the deposition, is that right?

"A No, sir. Actually, I worked for them for about two weeks after the deposition.

"Q I have written down that you quit on May 30. Is that wrong?

"A Correct. I am sorry. When did I get the deposition?

"Q The deposition is dated May 29, 1986; so about mid-June?

"A I am sorry. Yes, that is correct.

"Q So you worked for them about—about four weeks after the point when you actually did get a copy of the written injunction contained in the judgment, is that right?

"A The injunction was sent May 19, is that right?

"Q Yes, ma'am.

"A Okay. So actually I worked for them two weeks. I did leave Bachynsky's employment the end of May, May 30. You're correct, a day or two after the deposition.

" . . .

"Q [By appellants' attorney]: Do I understand then, Mrs. Levine, that from May 19, 1986, until May 30, 1986, that that is the only time that you continued to work for Dr. Bachynsky or for the clinic in Dallas?

"A That is correct.

" . . .

"Q [By the State's attorney]: Now, Geri Levine was the telemarketing person at the clinic here in Dallas, is that correct?

"A [Nicholas Bachynsky]: That is correct.

"Q And her job as telemarketer was to take phone calls regarding the operations of the clinic, is that right?

"A I believe her job was to give in the phone when she would get phone calls from them.

"Q She got no description and no training before she went on the job, isn't that correct?

"A I don't know anything about that.

" . . .

"Q I am going to show you a copy of the deposition.... I asked you a question there and I would like for you to read your response.

QUESTION: What kind of description or training of her, if you want to check to make sure, that is, referring to Miss Levine, what kind of training or screening of her was done?

[State's attorney]: What was your answer?

ANSWER: Well, nothing. She basically answers the phone.

"Q Okay. Does that refresh your memory that, in fact, earlier you said you don't know whether she got screening or training and in May you told me she didn't get screening or training, is that correct?

"A Well, I don't know what happens at the Dallas Clinic.

"Q Okay.

"A That is just my answer that was to the best of my knowledge that I would give you the answer. I am assuming she answers the phone."

We are inclined to agree with the State that this evidence is hardly more than a scintilla that Levine was employed by Bachynsky individually. Levine's reference to leaving "Bachynsky's employment", in context, refers to the Clinic, not him individually. Appellants' attorney's reference to Levine's working "for Dr. Bachynsky or for the clinic" appears to be a misstatement. Even if these two references were some evidence, they would clearly be against the great weight and preponderance of the evidence, viz, Levine's and Ba-

chynsky's straightforward testimony that Levine was employed by the Clinic.

### 2

■ The State concedes that no testimony or exhibits offered in the enforcement proceeding support the district court's finding that the Clinic was Bachynsky's alter ego. However, the State contends that the finding can be supported by evidence offered at the injunction proceeding.

The judgment in the injunction proceeding contains no finding of alter ego. The closest it comes is the following:

As to certain evidentiary issues not submitted to the jury, the court FINDS as follows:

1. That Defendant Nicholas Bachynsky acted by and through the corporate Defendants, all of which were used by Defendant Bachynsky for the purpose of selling, delivering, offering for sale, holding for sale, giving away, prescribing, dispensing, and otherwise making available to individuals in the State of Texas the drug known as 2,4 Dinitrophenol ("DNP").

.    .    .    .    .

The Court is further of the opinion:

.    .    .    .    .

2. That because all Defendants acted jointly in violating these Acts, it is necessary to enjoin Defendant Bachynsky individually as well, in order to insure that the corporate Defendants' illegal actions are fully restrained....

Neither acting through nor acting with a corporation equate to alter ego, which requires that a person use a corporation as a sham for fraud. *First Nat'l Bank v. Gamble*, 134 Tex. 112, 132 S.W.2d 100 (Tex. 1939). The district court did not make a finding of alter ego in its prior judgment, either in name or in substance.

Even if the district court had made such a finding in the prior judgment, it would have no effect. Alter ego is a question of fact for the finder of fact, in this case, the jury. The jury was not asked to make any such finding and did not do so. Therefore, the district court was not authorized to find facts, and its findings are entitled to no weight. *Conrad v. Judson*, 465 S.W.2d 819 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.).

Furthermore, evidence at the injunction proceeding, of which the district court took judicial notice in this enforcement proceeding, cannot support the finding in this proceeding that the Clinic was Bachynsky's alter ego. The trial of the injunction proceeding ended in March 1986. Any evidence of alter ego offered at that trial would necessarily have pertained to some time period prior to the trial. No witness could have been competent to testify that Bachynsky would operate the Clinic as his alter ego in the future. The time period with which we are here concerned is from April 10, 1986, when the judgment was signed, to May 30, 1986, when Levine left the employ of the Clinic. It is absolutely impossible for there to have been any evidence in the injunction proceeding of alter ego during the then future period at issue here.

Neither is alter ego a "reasonable inference" from the record in the prior proceedings. To make this inference would be to hold that once an alter ego, always an alter ego. Future wrongdoing should not be inferred from past wrongdoing. To the contrary, it is at least as likely if not more likely that a person found to operate a corporation as his alter ego would immediately cease doing so.

There is absolutely no evidence in this record that Bachynsky operated the Clinic as his alter ego during the time period in which violations of the injunction are alleged to have occurred.

### 3

Inasmuch as there is either no evidence or insufficient evidence that Levine was employed by Bachynsky, and no evidence that the Clinic was Bachynsky's alter ego, there is no basis from which to conclude that Bachynsky violated the injunction

through Levine's conduct.[10]

### III

There is no evidence that Bachynsky violated the injunction, and therefore the $50,000 penalty assessed against him must be reversed and judgment rendered that the State take nothing against him in this enforcement proceeding.

As for the Clinic, there is clear evidence of only one, and some evidence of at most seven, violations of the injunction. Under the DTPA, the maximum civil penalty for each violation of the injunction is $10,000, and the maximum penalty for each violator is $50,000. Tex.Bus. & Comm.Code Ann. § 17.47(e) (Vernon Supp.1977). The district court assessed the maximum penalty of $50,000 against the Clinic, but it did so after concluding that the Clinic had violated the injunction 106 times. The State argues that as long as there is evidence of at least five violations, the penalty against the Clinic should be affirmed. However, we cannot simply assume that the district court either would have or should have assessed the maximum penalty against the Clinic for one to seven violations of this nature. Accordingly, we reverse the $50,000 penalty assessed against the Clinic and remand the case for further proceedings.

STEWART, J., dissents.

STEWART, Justice, dissenting.

I respectfully dissent. I agree with the majority that appellants' third point, attacking the validity of the injunction in this enforcement proceeding, should be overruled. However, I disagree with the majority's construction of paragraph 7 of the injunction and with its rulings on appellant's first two points of error. Consequently, I would affirm the trial court's judgment.

### I. CONSTRUCTION OF PARAGRAPH 7

The majority *sua sponte* undertake to construe the language of paragraph 7 of the injunction and then to determine the appellant's evidentiary points in light of their own construction. They offer only two possible constructions of the language in that paragraph. I disagree with both. If we were called upon to construe the language at all, I would hold that the language "Failing to advise patients or prospective patients ..." means that any enjoined person must give the prescribed warnings to any patient or prospective patient with whom that person comes in contact. The language does not require seeking out all patients or prospective patients by all persons enjoined, nor does it require every patient or prospective patient be advised by some enjoined person.

I venture that the State will be relieved to know that it can prove violations of paragraph 7 by simply producing patients or prospective patients who have not been advised of the prescribed warnings by any person in the enjoined group, since Bachynsky and the clinics have thousands of patients and appellants were dilatory in informing even their own employees of the injunction, much less all of their patients. The majority's construction puts a much greater burden on appellants than is warranted by the language of the paragraph. Thus, I would construe paragraph 7 as did the trial court, the State, and apparently, the appellants, as the latter have not challenged the judgment on the grounds that the trial court misconstrued the language of paragraph 7 or because the State failed to produce a patient or prospective patient who had not been informed by anyone of the prescribed warnings contained in that paragraph. Based on that construction, I conclude that the State could properly prove violations of this paragraph by producing an employee of the clinic who failed to give the required warnings to patients or prospective patients.

### II. SUFFICIENCY OF EVIDENCE

In point of error one, Bachynsky and the clinic argue that the trial court's findings

10. Appellants' points of error one and two are  sustained.

of fact are either supported by no evidence or are contrary to the only evidence offered. In their "Statement of Facts Relative to Point of Error Number One," they list twenty-one fact findings that they contend are supported by no evidence and twelve fact findings that they contend "are not only supported by no evidence in this record but are directly contrary to the only evidence presented on the issue." I construe the latter argument to mean that those findings of fact are contrary to the great weight and preponderance of the evidence.

However, in their argument relative to their first point, they address only the court's findings which delineate the acts constituting violations of the injunction and those findings which negate the appellants' contention that they made a good faith effort toward compliance and, therefore, injunctive remedies should not be enforced. I first consider only those findings addressed by Bachynsky and the clinic in their argument.

Bachynsky and the clinic contend that the following findings are not only supported by no evidence but are contrary to the only evidence presented:

15. On at least six separate occasions during this period, Defendants violated paragraph 6 of the injunction when Levine represented to patients or prospective patients that 2,4 Dinitrophenol ("DNP") is a safe drug for use in a weight-loss program.

16. On at least 50 separate occasions during this period, Defendants violated paragraph 7 of the injunction when Levine failed to advise patients and prospective patients that DNP is not generally recognized as safe in the treatment of obesity, that DNP is a highly toxic substance, and that DNP is a herbicide.

They also maintain that there is no evidence to support the following finding:

17. On at least 50 separate occasions during this period, Defendants violated paragraph 5 of the injunction when Levine solicited patients with the intent of prescribing, dispensing or otherwise distributing DNP to patients in the future.

When deciding a no-evidence point of error, appellate courts must consider only the evidence and inferences that support the fact findings and disregard all evidence and inferences to the contrary. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W. 2d 206 (Tex.1985). When determining if a finding is against the great weight and preponderance of the evidence, the appellate court must consider and weigh all the evidence in the case and should set aside the verdict and remand the cause for a new trial only if the court concludes that the finding of fact is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951). Examples of fact findings that are against the great weight of the evidence are findings that shock the conscience, that are manifestly unjust, and that clearly demonstrate bias or prejudice. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g).

Regarding the two to six phone calls from people inquiring about DNP, Bachynsky and the clinic maintain that Levine told these persons that the clinic was no longer dispensing it and that, only in her opinion, DNP was safe. The majority concedes that Levine was talking to callers as an employee. Thus, the qualification that she was expressing only her personal opinion is irrelevant because paragraph six of the injunction enjoined "representing that DNP [was] a safe drug for use in a weight-loss program." Consequently, the trial court could reasonably infer that Levine violated the injunction at least two to six times.

Bachynsky and the clinic argue that the fifty to sixty other phone calls were from persons who supported DNP and, therefore, required no response by Levine. Levine testified that these fifty to sixty persons "were hoping that the case would go the other way, because the product was working for them." The trial judge may consider all facts and circumstances in evi-

dence and indulge in reasonable inferences therefrom in reaching his ultimate findings. *Brown v. Gonzales*, 653 S.W.2d 854, 857 (Tex.App.—San Antonio 1983, no writ). Because these people were using DNP, it was permissible for the trial court to find that they were patients of the clinic. This finding brought these fifty to sixty phone calls within paragraph seven of the injunction. Levine testified that she failed to tell these patients that DNP was not generally recognized as safe, was highly toxic, and was a herbicide. Paragraph seven required the clinic's employees, among others, to advise patients or prospective patients of these aspects of DNP. Depending upon how one tallies violations of paragraph seven, the trial court could find that Levine violated it from fifty to 180 times. I agree with the majority that there is no evidence to support finding 17; however, even omitting these 50 violations, there are a sufficient number proved to sustain awarding the State the maximum penalty available under the statute.

Bachynsky and the clinic next contend that they made a good faith effort to comply with the injunction, and, therefore, the statutory penalties should not have been granted. They argue that they (1) returned all DNP and DNP promotional material, (2) immediately notified by telephone all clinic managers to stop using DNP, (3) dispatched a written memorandum verifying the earlier telephone message, (4) furnished each clinic with instructions for compliance, (5) did not enroll anyone for DNP treatments, (6) transferred their DNP patients to other medications, and (7) instructed Stalone, who was in charge of the clinic counselors, to disseminate information to all clinics that DNP would no longer be used or discussed.

Their steps one through three, five, and six address compliance with paragraph one of the injunction, which is not at issue here. Step four refers to a letter written by Bachynsky's attorney, which he sent presumably on May 15, over a month after the trial court signed the injunction and after

the violations at issue had already occurred. Step seven is no defense to paragraph seven of the injunction. Stalone was in charge of the clinic counselors; she was not in charge of all employees as evidenced by the fact that Bachynsky identified Henderson as Levine's superior. Furthermore, Bachynsky told Stalone not to use or discuss DNP, which still fails to comply with paragraph seven of the injunction, which requires affirmative disclosures about DNP.

For the foregoing reasons, I conclude that there is some evidence in our record to support two of the findings specifically attacked by Bachynsky and the clinic in their argument and that these findings are not against the great weight and preponderance of the evidence. These findings alone are sufficient to establish 52–184 violations of the injunction. Regarding the other findings listed but not specifically argued by appellants, I agree with the majority that the trial court's finding that Bachynsky, individually, was Levine's employer is against the great weight and preponderance of the evidence. However, I will address the alter ego findings under appellants' second point of error. As to the remainder of the listed findings, none is in conflict with those addressed in this dissent, nor are any of them necessary to the affirmance of the judgment. Consequently, they need not be discussed.

Under the same point, Bachynsky and the clinic next contend that rule 683 of the Texas Rules of Civil Procedure defeats the State's recovery for the violations. Rule 683 provides: "Every order granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." TEX.R.CIV.P. 683 (Vernon Supp.1987). Because Levine did not see a copy of the April 10 injunction until May 19, Bachynsky and the clinic argue that she may not be bound by it before knowing its contents.

For the reasons given below, I would hold that Levine's lack of knowledge of the injunction does not preclude finding that her actions constitute violations of the injunction by Bachynsky and the clinic. First, section 17.47(e) of the DTPA does not require that the injunction be "knowingly" violated. *Medical Slenderizing, Inc. v. State*, 579 S.W.2d 569, 573 (Tex.App.—Tyler 1979, writ ref'd n.r.e.). Second, under rule 683, employees of the person enjoined are bound by the injunction though they have no actual notice of its terms. *See* TEX.R.CIV.P. 683. Further, the State is not attempting to penalize Levine individually; rather, the State is attempting to penalize her employers, Bachynsky and the clinic, who had received actual notice. Third, the general rule is that an employer may be held accountable for the wrongful act that his employee committed while acting in his employer's business and within the scope of his employment, even if the employer had no knowledge of the employee's act or had even expressly forbidden it. *Medical Slenderizing, Inc.*, 579 S.W.2d at 574. The act of the employee, while exercising the authority delegated to him, may be imputed to his employer, thereby subjecting the employer to the penalties imposed by section 17.47(e) of the DTPA. *Id.* Bachynsky and the clinic's argument is without merit.

Bachynsky and the clinic assert that the State's attorney had the burden of informing their employees of the terms of the injunction. For their authority, they point to rule 683 and emphasize that attorneys are bound by the injunction. Rule 683 states that the injunction binds the parties and their attorneys. TEX.R.CIV.P. 683. This provision applies only to the attorneys of the parties enjoined; consequently, it does not apply to the State's attorney. Finding no merit to any of appellants' arguments, I would overrule their first point of error.

## III. CONCLUSIONS OF LAW

In appellants' second point of error, they argue that the trial court erred in basing its judgment in part upon erroneous conclusions of law. Bachynsky attacks conclusions of law seven through fifteen, which address the clinic's being Bachynsky's alter ego and the liability of each appellant for Levine's actions. Bachynsky admits that it is undisputed that Levine was an employee of the clinic; however, Bachynsky asserts that the record is devoid of any evidence establishing the nature of the association between the clinic and Bachynsky or the duties either appellant had toward Levine. Bachynsky contends that no evidence was adduced in this civil penalties action to support the trial court's conclusion that he was medical director, officer, director or even a stockholder of the clinic. In other words, he contends the State must again prove his relationship to the clinic. Consequently, contends Bachynsky, the trial court could not conclude as a matter of law that the clinic was his alter ego or that he was individually bound by Levine's conduct.

As previously stated, I agree that Bachynsky, individually, was not Levine's employer. However, I disagree with the majority that there is no evidence in the enforcement proceeding to support the trial court's finding that the clinic was Bachynsky's alter ego. Further, for the following reasons, I would hold that the evidence offered in the jury trial on the merits could be considered by the trial court in support of its finding of alter ego in the enforcement proceeding.

The testimony taken at a previous trial cannot be considered by the trial judge in a subsequent trial unless it is admitted at the trial. *Amco Mesh & Wire Co. v. Stewart*, 474 S.W.2d 740, 741–42 (Tex.Civ.App.—Houston [1st Dist.] 1971, no writ). However, section 17.47(e) specifically provides: "For purposes of this section, the district court issuing the injunction shall retain jurisdiction and the cause *shall be continued*,...." "TEX.BUS. & COM.CODE § 17.47(e) (Emphasis added). Thus, this ancillary proceeding to collect civil penalties is not a subsequent trial; instead, it is a *continuation* of the injunction suit and

the trial court could take judicial notice of the evidence produced in the prior jury trial in making its findings of fact.

Furthermore, the trial court announced that it was taking judicial notice of the earlier proceeding. Bachynsky did not object at trial to the court's taking judicial notice of the earlier proceeding on the merits. To complain on appeal, a party must preserve the complaint at the trial court level by motion, exception, objection, plea in abatement, or some other vehicle. TEX. R.APP.P. 52(a) "The complainant must identify the objectionable matter or event sufficiently for the opposite party to cure any deficiency and for the trial judge to know the nature of the alleged error." *PGP Gas Products, Inc. v. Fariss,* 620 S.W.2d 559, 560 (Tex.1981).

Because we do not have the statement of facts of the prior hearing before us, we must presume that the evidence therein supports the trial court's findings. *Guthrie v. National Homes Corp.,* 394 S.W.2d 494, 495 (Tex.1965).

Thus, I must presume that the following findings are supported by the evidence adduced during the jury trial:

4. Defendant Bachynsky incorporated and set up Physician's Clinic of Dallas, Inc. as a means of perpetrating the false, misleading and deceptive acts found by the jury in this case.

6. Defendant Bachynsky has controlled and dominated the corporate affairs of [the clinic] to such a degree that the corporate entity is no more than Bachynsky's alter ego.

7. As a consequence of Defendant Bachynsky's formation, misuse, control and domination of Defendant Physician's Clinic of Dallas, Inc., adherence to the fiction of separate existence of the corporation would sanction a fraud and promote injustice.

8. The corporate entity should be disregarded and Defendant Bachynsky should be held personally liable for all of the violations of the Judgment commit-

ted by Physician's Clinic of Dallas, Inc. and found by this Court.

In the judgment on the merits, the trial court further found that Bachynsky acted by and through the corporate defendants to make DNP available to individuals in Texas, in violation of the Texas Deceptive Trade Practices Act and the Texas Food, Drug and Cosmetic Act. I must likewise presume that the evidence produced at the trial on the merits supports these findings. *Id.*

Once evidence is presented to support a fact of a continuous nature, it is presumed that the state of things continues to exist as before until the contrary is shown or until a different presumption arises. *Commercial Credit Corporation v. Smith,* 143 Tex. 612, 187 S.W.2d 363, 366 (1945). That presumption is conclusively established in the absences of evidence to the contrary. *Pete v. Stevens,* 582 S.W.2d 892, 894 (Tex. Civ.App.—San Antonio 1979, writ ref'd n.r. e.). Bachynsky presented no evidence in the enforcement hearing to prove that the clinic was no longer his alter ego; consequently, the presumption that that status continued to exist at that time was conclusively established. *Id.*

Further, the statement of facts of the enforcement hearing reflects that Bachynsky was the only defense witness. He testified to appellants' efforts to comply in good faith with the injunction. A close examination of his testimony reveals that all instructions and directions to subordinates were from him; he sent the memorandum to the clinics to stop using DNP. His testimony does not reflect independent actions by anyone else to attempt to comply with the injunction. Moreover, Levine testified on cross-examination by Bachynsky's attorney that after May 19, she handled the one call she received inquiring about DNP as follows:

A   I told them that we were not allowed to discuss dimitrophenal over the phone, were not allowed to discuss it.

Q   Did you cut the conversation immediately off after you told them that?

A   I told them that as far as I can remember.   I told them that we were using the new product and that I would be happy to set them up an appointment to come in and discuss the new product.

.       .       .       .       .

Q   And was that as per instructions from Dr. Bachynsky's attorney?

A   And Dr. Bachynsky, yes.

In addition, Bachynsky's attorney repeatedly referred to the clinics as "your" clinics when questioning Bachynsky, as the following example illustrates:

Q   Dr. Bachynsky, from March 21, 1986, as I understand it, ... on that date up until today, has any one of *your* clinics enrolled anybody using DNP?

A   No, sir.

Q   What steps did *you* take and when as to informing *your* clinics of the effects of the partial permanent injunction [the judge] rendered on March 31 (sic)?

(Emphasis supplied)

Throughout his testimony, Bachynsky never corrected either attorney when they consistently referred to "your" staff and "your" clinics.   Both attorneys obviously assumed in their questions that the clinics were owned and controlled by Bachynsky. Bachynsky never objected nor denied these assumptions.

Thus, I conclude that the trial court could also reasonably infer from the evidence at the enforcement hearing that Bachynsky had an ownership interest in the clinics and that he had continued to dominate and control the corporate affairs of "his" clinics, including Physicians Clinic of Dallas, Inc., during the period from the end of the trial on the merits on March 21, 1986 through the date of the enforcement hearing on July 31, 1986.

The findings show that Bachynsky used the clinics as a sham to perpetrate fraud and to avoid the effects of the Texas Deceptive Trade Practices Act and the Texas Food, Drug and Cosmetic Act.   Under such circumstances, courts may disregard the corporate fiction and hold individual officers, directors or stockholders liable for corporate obligations.   *Sapphire Homes, Inc. v. Gilbert,* 426 S.W.2d 278, 283–284 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r.e.).

I would hold that there was both legally and factually sufficient evidence to support the trial court's findings that the clinic is no more than Bachynsky's alter ego, that adherence to the fiction of the separate existence of the corporation would sanction a fraud and promote injustice, and that the corporate entity should be disregarded and Bachynsky should be held personally liable for the clinic's violations of the injunction. Based on these findings, I would further hold that the trial court's conclusions of law seven through fifteen are not erroneous.

Within point of error two, appellants also attack conclusions of law one and five. Conclusion of law one states, "[t]he permanent injunction contained in the Judgment signed on April 10, 1986 ('injunction') was an injunction under Section 17.47 of the Deceptive Trade Practices Act, Tex.Bus. & Comm.Code § 17.41 *et seq* ('DTPA')," and conclusion of law five provides, "[t]his is a proceeding to collect civil penalties and is not a civil or criminal contempt proceeding."

Appellants contend that these conclusions are an attempt to remove this injunction from rule 683, which makes no distinction between a civil or criminal contempt proceeding and one for civil penalties. Rule 683 does not address remedies for violation of an injunction; consequently, I fail to see how its terms are relevant here. However, appellant seems to be arguing that because civil and criminal contempt proceedings are the usual remedies for violation of an injunction and because these remedies require a finding of a knowing or intentional violation, the trial court erred in its finding in the judgment that section 17.47(e) imposes strict liability and that a knowing or intentional violation is not required before civil penalties may be assessed.   I agree with the trial court that

the statute does not require a knowing or intentional violation. *Medical Slenderizing, Inc.,* 579 S.W.2d at 573.

Appellants next focus upon language contained in section 17.47(e) of the DTPA: "[i]n determining whether or not an injunction has been violated the Court *shall* take into consideration the maintenance of procedures reasonably adapted to insure compliance with the injunction." TEX.BUS. & COM.CODE ANN. § 17.47(e) (Vernon Supp.1987) (emphasis supplied). Appellants argue that under this provision the trial court must affirmatively find an absence of procedures reasonably calculated to insure compliance before a violation occurs under this statute. Furthermore, argue appellants, the evidence abundantly illustrates the maintenance of reasonable efforts to comply.

I disagree with appellants' contentions. The above language merely requires the court to consider whether reasonable procedures have been employed in determining whether the injunction has been violated. Furthermore, in findings of fact three and twelve, the trial court affirmatively found that appellants failed to employ reasonable procedures to insure compliance, and I would hold that those findings are supported by the evidence adduced in the civil penalties proceeding.

Bachynsky and the clinic also list conclusions of law sixteen through eighteen as erroneous; however, they fail to explain in their argument how they are erroneous. I would refuse to speculate on their behalf. I would overrule appellant's second point of error.

I would affirm the judgment.