**John L. MORGAN, Plaintiff,**

v.

**Dana G. RINEHART, et al., Defendants.**

No. C2–90–780.

United States District Court,
S.D. Ohio, E.D.

July 30, 1992.

Edna Marianne Gabel, Delaware, OH, Gunther Karl Lahm, Luper, Wolinetz, Sheriff & Neidenthal, Emily Jane Lewis, Columbus, OH, for plaintiff.

Glenn Brooks Redick, City Attorney's Office, Columbus, OH, for defendants.

### MEMORANDUM and ORDER

BECKWITH, District Judge.

This matter is currently before the Court on the Defendants' motion for summary judgment and the Plaintiff's motion for partial summary judgment. This case arose when the Plaintiff, the former Deputy Development Director for the City of Columbus, filed suit against the City of Columbus, Dana G. Rinehart, the former Mayor of Columbus, Raymond Lorello, the former Director of Development for Columbus, and Jane Schoedinger, the current Director of Development.

On January 24, 1988, the Plaintiff was appointed the Deputy Development Director for the City of Columbus. At that time, Raymond Lorello was the Plaintiff's appoint-ing authority and immediate superior while Dana Rinehart was the Mayor of Columbus and Mr. Lorello's immediate superior. By the time this case was filed, Jane Schoedinger was the Director of Development for the City of Columbus.

In October of 1988, while Plaintiff was serving as Deputy Development Director, and no longer a member of the Columbus Police Division, the Internal Affairs Bureau of the Columbus Police Division ("Internal Affairs Bureau") began a formal investigation into the Plaintiff's alleged 1983 surveillance of a Columbus family, the Pardues. In 1983, the Plaintiff was a Columbus police officer. The Pardues had alleged that Mr. Rinehart sexually molested their daughter, Vicki Pardue, while she was babysitting for the Rineharts.

The Internal Affairs Bureau was acting as an investigative arm of the City Solicitor's office pursuant to a City Council directive. The City Solicitor's office was not equipped to investigate the alleged 1983 surveillance, as requested by City Council. It, therefore, sought the assistance and expertise of the Internal Affairs Bureau, since the allegations implicated a former Columbus police officer and might have involved improper on-duty conduct.

Mr. Lorello ordered the Plaintiff to appear before the Internal Affairs Bureau on October 21, 1988, to answer questions relating to the alleged surveillance of the Pardue family. On October 21, 1988, the Plaintiff appeared before the Internal Affairs Bureau, read a prepared statement, and refused to answer questions. On October 25, 1988, the Plaintiff was discharged from his position as Deputy Development Director for insubordination. The Plaintiff has brought claims pursuant to 42 U.S.C. § 1983 for violation of his constitutional rights and pendent state law claims for breach of public policy, breach of contract, promissory estoppel and intentional infliction of emotional distress. Under § 1983, the Plaintiff claims that he was discharged for exercising his constitutional right against self-incrimination when he was subjected to questioning, without a grant of immunity, about his alleged surveillance of the Pardues.

In their motion for summary judgment, the Defendants assert that no city policy led to the discharge of the Plaintiff. The Defendants also assert that public employees can be discharged for refusing to answer questions concerning their employment activity if they are not required to waive their constitutional rights. The Defendants further assert that the suit against the individual defendants in their official capacities is a suit against the City of Columbus and thus that the individual defendants should be dismissed. The Defendants also contend that the pendent state law claims should be dismissed if the Defendants prevail on their argument that no federal claim has been established.

### Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides:

> [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The purpose of a summary judgment motion is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir.1978).

In 1986, the United States Supreme Court issued three decisions which gave new life to Rule 56 as a mechanism for weeding out meritless claims at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is well recognized that these cases brought about a "new era" in summary judgment practice. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989). The three opinions by the Supreme Court reflect a return to the original purpose of the summary judgment motion. *Id.*

Accordingly, the summary judgment "standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–8, 106 S.Ct. at 2509–10 (emphasis in original). Moreover, when a party cannot establish the existence of an element essential to that party's case on which the party will have the burden of proof at trial, the Court must enter summary judgment against that party, pursuant to Rule 56. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. Thus, in order to survive a motion for summary judgment, a Plaintiff "must come forward with more persuasive evidence to support their claims than would otherwise be necessary." *Matsushita*, 475 U.S. at 575, 106 S.Ct. at 1349.

Rule 56(e) of the Federal Rules of Civil Procedure provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment if appropriate, shall be entered against the adverse party.

Accordingly, mere allegations are not sufficient to defeat summary judgment. The Court can now apply this standard to the Defendants' motion for summary judgment.

### Analysis

The Plaintiff asserts that the Defendants improperly discharged him for exercising his Fifth Amendment privilege against self-incrimination. The Fifth Amendment provides that: "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment privilege "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also

privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). The Fifth Amendment privilege can be raised "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicative." *Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1971); *In re Morganroth*, 718 F.2d 161 (6th Cir.1983). When an individual asserts the privilege, "he 'may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without at that time being assured that neither it or its fruits may be used against him' in a subsequent criminal proceeding." *Minnesota v. Murphy*, 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984) (quoting *Maness v. Meyers*, 419 U.S. 449, 473, 95 S.Ct. 584, 598, 42 L.Ed.2d 574 (1975) (White, J. concurring in result)). It is well settled that the Fifth Amendment is applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1963).

The United States Supreme Court has held that the Fifth Amendment privilege against self-incrimination is not a self-executing mechanism. *Roberts v. United States*, 445 U.S. 552, 559, 100 S.Ct. 1358, 1363, 63 L.Ed.2d 622 (1980). The Supreme Court has also held that the privilege can be waived or lost by a claimant's failure to assert the privilege in a timely fashion. *Maness*, 419 U.S. at 466, 95 S.Ct. at 595. Previously, the Supreme Court stated that the privilege "must be deemed waived if not in some manner fairly brought to the attention of the tribunal which must pass upon it." *Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 113, 47 S.Ct. 302, 306, 71 L.Ed. 560 (1927).

In this case, the Plaintiff was called before the Internal Affairs Bureau on October 21, 1988. The interview was conducted by Sergeant William Smith. During the interview, the Plaintiff was represented by three attorneys, Lawrence Riehl, Gunther Lahm and Wallace Neidenthal. The Plaintiff is also an attorney. The following is a complete transcript of the interview:

Q: Mr. Morgan, would you please identify yourself?

A: John L. Morgan

Q: Mr. Morgan, are you aware that this interview is being tape recorded?

A: Yes, I am.

Q: Mr. Morgan, the purpose of this interview is to have you answer questions concerning the investigation that you conducted of the Pardue family during the 1983 campaign of Dana Rinehart. At this point are you willing to answer questions?

A: No, I am not.

Q: Do you want to make a statement?

A: At the Mayor's directive, I'm meeting with Internal Affairs relative to the allegations about a 1983 investigation of the Pardue family. This investigation was apparently initiated as a result of an interview I was directed by the Mayor and his staff to give to Gary Webb of the Cleveland Plain Dealer. Prior to giving this interview, I consulted with and obtained legal advice from the Columbus City Attorney. The Plain Dealer article which resulted from that interview was slanted, inaccurate, misleading and incomplete.

Since the publication of that article, apparently an uncertain number of investigations including those by the Columbus Division of Police, the Columbus Public Safety Department, the Columbus City Attorney's Office, the Columbus City Council and the Federal Bureau of Investigation have been initiated. Some of the very same offices that directed me and from whom I received legal advice have initiated or are now conducting the investigations. Furthermore, since the publication of the article, I have received numerous communications from the Mayor, several aides to the Mayor, Councilman John P. Kennedy, police officers involved in the investigation, police officers not involved in the investigation, representatives of the Fraternal Order of Police and others. All of this

has led to an extremely confusing and contradictory situation that leaves me unable to respond to questions at this time. I appreciate the countless communications from friends and others throughout the community who know me and have given me their support. That is my statement in its entirety today.

Q: Mr. Morgan, would you be willing to turn over to us a copy of the tape recording that you had with Mr. Gary Webb of the Plain Dealer?

A: I have nothing further to say today.

Q: Thank you.

The Defendants argue that the Plaintiff did not indicate to the Internal Affairs Bureau that he was claiming a privilege under the Fifth Amendment. In his statement at the Internal Affairs Bureau interview, the Plaintiff stated that he was refusing to answer any questions due to the "confusing and contradictory situation." The Plaintiff never gave any indication at the interview that he was refusing to answer questions because he was afraid that he might incriminate himself. After thoroughly reviewing the Plaintiff's answers at the interview, the Court concludes as a matter of law that none of the Plaintiff's responses could be construed as an attempt to claim or invoke the Fifth Amendment privilege at the Internal Affairs Bureau interview.

■ The Court finds that one who wishes to assert a Fifth Amendment privilege against self-incrimination must affirmatively assert the privilege to the appropriate tribunal at an appropriate time. Clearly, the Plaintiff did not inform the appropriate tribunal, the Internal Affairs Bureau, of his intention to claim a Fifth Amendment privilege at the appropriate time, his interview on October 21, 1988.

The Plaintiff, however, asserts that he, through his attorneys, invoked his privilege against self-incrimination prior to the October 21, 1988 interview with the Internal Affairs Bureau. The Plaintiff alleges that the Plaintiff's attorneys spoke with city attorneys and others in the city administration about the Plaintiff's fear of prosecution and thus invoked the privilege. The Defendants, however, argue that any such statements to other parties are irrelevant because the other parties were not conducting the investigation. The Defendants question why the Plaintiff and his attorneys did not also inform the Internal Affairs Bureau itself of the Plaintiff's intention to claim the Fifth Amendment privilege if they had already informed others in the city's administration of the Plaintiff's intention to claim the Fifth Amendment at the interview.

The Court finds that the other conversations which occurred outside the interview conducted by the Internal Affairs Bureau are irrelevant to the issue of whether the Plaintiff effectively invoked the Fifth Amendment privilege at the critical time and place. The Court agrees with the Defendants that these other individuals were not conducting the investigation and could not accept or reject a claim of privilege. In this case, the Internal Affairs Bureau was the appropriate tribunal where the Plaintiff should have raised the Fifth Amendment privilege if he intended to do so. Any conversations which the Plaintiff and his counsel had with city attorneys or officials outside of the Internal Affairs Bureau hearing are irrelevant to the question of whether the Plaintiff properly claimed the Fifth Amendment privilege at the critical time and place.

■ The Defendants also argue that a public employee can be discharged for not obeying an order to answer questions concerning the employee's employment activity as long as the employee is not required to relinquish constitutional rights. Before reaching the merits of the Defendants' argument, the Court must review the applicable case law.

In 1967, the United States Supreme Court held that when police officers being investigated were given a choice either to incriminate themselves or to lose their jobs pursuant to a state law, and the officers chose to make confessions, such confessions were not voluntary but were coerced, and thus the Fourteenth Amendment precluded their usage in a subsequent criminal prosecution. *Garrity v. State of New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). In *Garrity*, the police officers had been asked to

testify in an Attorney General investigation which concerned the alleged fixing of traffic tickets. *Id.,* at 494, 87 S.Ct. at 617. Before the questioning, each officer was informed "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office." *Id.* Although no immunity from prosecution was granted, the officers answered the questions at the investigation. *Id.* at 495, 87 S.Ct. at 617. Later, certain answers of the officers were used against the officers in prosecutions even though the officers objected. *Id.*

In delivering the opinion of the Court in *Garrity,* Justice Douglas wrote:

> [t]he choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda v. State of Arizona,* ... is 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

*Id.* at 497–8, 87 S.Ct. at 618–19 (citation omitted) (footnote omitted). Justice Douglas concluded that pursuant to the protection of the individual under the Fourteenth Amendment, coerced statements obtained through a threat of removal from employment are prohibited from any usage in a subsequent criminal proceeding. *Id.* at 500, 87 S.Ct. at 620.

In 1968, the Supreme Court issued two other opinions which further illuminate this area. First, the Court held that a police officer was entitled to immunity when he was required to testify although the self-incrimination privilege would not bar a subsequent dismissal if the officer refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties. *Gardner v. Broderick,* 392 U.S. 273,

88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). In *Gardner,* a policeman asserted that he had been unlawfully dismissed because he refused to waive his constitutional privilege against self-incrimination. *Id.* at 274, 88 S.Ct. at 1914. Pursuant to a subpoena, the policeman had appeared before a New York County grand jury that was investigating the alleged bribery and corruption of police officers in connection with unlawful gambling operations. *Id.* Although he was informed of his privilege against self-incrimination, the policeman was told that he would be fired if he did not sign a waiver of immunity. *Id.* After he refused to sign the waiver, the policeman was discharged solely for this refusal to sign under New York City Charter § 1123. *Id.* at 275, 88 S.Ct. at 1914.

In delivering the opinion of the Court in *Gardner,* Justice Fortas wrote:

> [i]f appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, *Garrity v. State of New Jersey, supra,* the privilege against self-incrimination would not have been a bar to his dismissal.

*Id.* at 278, 88 S.Ct. at 1916. (footnote omitted). Unlike the case presently under consideration, the plaintiff in *Gardner* was discharged for his refusal to expressly waive a constitutional right and not for his refusal to answer relevant questions about his official duties.

In another case decided the same day as *Gardner,* the Supreme Court held that the constitutional privilege against self-incrimination was violated when city employees were discharged for invoking this privilege before an investigation commissioner who had advised them that their answers could be used against them in subsequent proceedings. *Uniformed Sanitation Men Ass'n. v. Commissioner of Sanitation,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). In the *Uniformed Sanitation Men* case, fifteen sanitation workers were brought before a hearing conducted by a commissioner of investigations. *Id.* at 281, 88 S.Ct. at 1918. The

commissioner was investigating charges that employees of the sanitation department were not charging certain fees for the use of certain city facilities and were keeping for themselves the fees which they did charge. *Id.*

The fifteen workers were each advised that if they refused to testify at the hearing on the grounds of self-incrimination, their employment with the city would end pursuant to a section of the New York City Charter. *Id.* at 281–2, 88 S.Ct. at 1918–19. After asserting the privilege against self-incrimination, twelve of the workers who refused to testify were dismissed by the city on the ground that they had refused to testify. *Id.* at 282, 88 S.Ct. at 1918–19. The other three workers answered questions at the hearing, but were suspended afterwards on the grounds of "information received from the Commissioner of Investigation concerning irregularities arising out of (their) employment in the Department of Sanitation." *Id.* Later, the three workers were asked to sign waivers of immunity in front of a grand jury and they refused. *Id.* The three workers were then discharged from their employment on the sole ground that they had violated the section of the City Charter by refusing to sign waivers of immunity. *Id.*

In *Uniformed Sanitation Men,* Justice Fortas, in delivering the opinion of the Court, noted first that the workers were not discharged for their refusal to account for their conduct as city employees. *Id.* at 283, 88 S.Ct. at 1919. Instead, Justice Fortas pointed out that the workers were discharged solely for invoking and refusing to waive their constitutional right against self-incrimination. *Id.* Justice Fortas wrote that:

> ... if New York had demanded that petitioners answer questions specifically, directly, and narrowly relating to the performance of their official duties on pain of dismissal from public employment without requiring relinquishment of the benefits of the constitutional privilege, and if they had refused to do so, this case would be entirely different. In such a case, the employee's right to immunity as a result of his compelled testimony would not be at stake. But here the precise and plain impact of the proceedings against petitioners as well

as of § 1123 of the New York Charter was to present them with a choice between surrendering their constitutional rights or their jobs. Petitioners as public employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination. At the same time, petitioners being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights.

*Id.* at 284–85, 88 S.Ct. at 1920. (citations omitted).

In this case, the parties agreed previously to certain stipulations in a proffer of stipulated facts in a related case heard by Judge Patrick West of the Court of Common Pleas of Franklin County. The parties agreed that the investigation of the Internal Affairs Bureau was aimed at determining, among other things: (1) whether John Morgan violated any criminal laws or otherwise engaged in conduct which could result in civil liability; (2) whether John Morgan's activities were conducted off duty or on duty; and (3) whether police department personnel, or anyone else, knew of Mr. Morgan's investigation or assisted him in it. The parties further agreed that John Morgan met with investigators from the Internal Affairs Bureau on October 21, 1988 and refused to answer any questions. The parties also agreed that at no time either prior to or during Mr. Morgan's interview with the Internal Affairs Bureau did any administration official, city attorney, or Internal Affairs Bureau member offer use immunity to John Morgan. The parties also agreed that Dana Rinehart spoke with John Morgan and told him to answer the questions of the Internal Affairs Bureau investigators or he would be fired. The parties further agreed that John Morgan was terminated by the City on October 26, 1988.

In his deposition, Defendant Lorello related a conversation which he had with the Plaintiff the day before the Plaintiff's appearance before the Internal Affairs Bureau.

Question: And do you recall how the matter was left between you and John?

Answer: Very vividly. John knew fully what my policy was. He also knew the ramifications, and we left on that basis ... I said, John, all I'm looking for is cooperation. *I'm not asking you to violate any of your actual rights,* but if you've got 10 to 12 questions and you can answer 7 of them by your own admission *without getting into the area of violating your rights,* then answer them. If you show no cooperation, I have no choice but to terminate....

(emphasis added). The Defendants thus assert that the City took no action which required a relinquishing of the Plaintiff's constitutional rights.

■ Upon review of the law in this area, the Court agrees with the Defendants that public employees can be discharged for refusing to answer questions concerning their employment activity if they are not required to waive their constitutional rights. In this case, the Court finds that the Plaintiff appeared before the Internal Affairs Bureau at a hearing on October 21, 1988 and refused to answer any questions whatsoever from the Internal Affairs Bureau. The Court thus finds that the Plaintiff was not required to waive any constitutional rights by being asked to respond to questions at the hearing.

The Court further finds that the Plaintiff did not ask the Internal Affairs Bureau or anyone else for immunity before the hearing and the parties also agree that no one offered the Plaintiff immunity. Since the question of granting the Plaintiff immunity never arose, the Plaintiff can not now argue that he was required to waive any immunity to testify at the hearing on October 21, 1988.

This case would have been entirely different if the Plaintiff had been required to sign a waiver of immunity like the policeman in *Gardner.* Here, however, the Plaintiff was not required or even asked to sign a waiver of immunity. Moreover, if the Plaintiff had testified at the hearing such statements would have been coerced under a threat of removal of employment and hence, any utilization of such statements in a subsequent criminal proceeding would be prohibited under *Garrity.* The Court, therefore, finds the Defendants' summary judgment motion to be meritorious. Although the Court finds that

it is not necessary to reach either the Plaintiff's or the Defendants' remaining arguments because it is granting the Defendants' motion for summary judgment for the reasons stated above, the Court will briefly address these other arguments.

■ The Defendants assert that the Plaintiff has not alleged that the Plaintiff was terminated pursuant to some official policy, practice or procedure. The Defendants argue that the Plaintiff has simply set forth that the Plaintiff was terminated from his employment and that there is no evidence that the City of Columbus has any such custom or practice of terminating employees who refuse to waive their constitutional rights. Thus, the Defendants argue that the Plaintiff has not established a claim for relief for a violation of 42 U.S.C. § 1983.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in action at law, suit in equity, or other proper proceeding for redress.

The Supreme Court recently noted that the first inquiry in a Section 1983 case is "whether there is a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). The Court further noted that a municipality may only be held liable under Section 1983 if the " 'execution of the government's policy or custom ... inflicts the injury.' " *Id.* at 385, 109 S.Ct. at 1203 (quoting *Springfield v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987) (O'Conner, J., dissenting).

The Plaintiff argues that the official city policy was that an employee was absolutely required to answer any questions concerning the employee's conduct as posed by the Internal Affairs Bureau. The Plaintiff argues that this official city policy did not recognize

any Fifth Amendment considerations of the employees. The Defendants, however, argue that the Plaintiff has offered no evidence that the City of Columbus had such a policy. The Defendants also argue that the City of Columbus did not have such a policy. The Court agrees with the Defendants that there is no evidence before the Court that the City of Columbus had such a policy.

There is evidence before the Court that some of the individual Defendants had individual policies advocating or emphasizing that all employees should be open and forthcoming in any type of investigation. There is, however, no evidence that these individual policies mandated that employees forfeit their Fifth Amendment rights when confronted with an investigation. The Court thus finds that the City of Columbus did not have a policy, practice, or custom of requiring employees to relinquish their Fifth Amendment rights when confronted with questions concerning the employee's conduct.

Furthermore, as the Court has already determined that the Plaintiff never properly invoked his Fifth Amendment privilege at the Internal Affairs Bureau hearing, the issue of whether the city had such a policy is irrelevant in this case.

■ Regarding the liability of the individual Defendants, the Court notes that according to the evidence presented by the parties, Defendant Rinehart did not actually terminate the Plaintiff. Defendant Rinehart also had no authority to reinstate the Plaintiff to his former position. The Court notes that Defendant Schoedinger apparently played no part in either the termination of the Plaintiff or the events which led up to the Plaintiff's termination. Accordingly, the Court finds that because there is no causal link between these two individual Defendants and the actions complained of, that the Plaintiff can not maintain a claim against Defendant Rinehart or Defendant Schoedinger.

■ As regards Defendant Lorello, the Court finds the uncontroverted evidence shows that he directed Plaintiff to answer such questions as he could ... "without getting into the area of violating your rights." Clearly, he did not require or even suggest that Plaintiff waive his Fifth Amendment privilege against self-incrimination. Consequently, there is no factual predicate for this Defendant's liability. Likewise, therefore, the Court finds no causal link between the actions of this individual Defendant and any alleged violation of Plaintiff's constitutional rights. Plaintiff was terminated by Defendant Lorello for refusing to answer any questions at the Internal Affairs Bureau interview. Since Plaintiff refused to answer any questions at the interview, the Court need not, indeed cannot, reach the issue of whether the questions which might have been asked were directly and narrowly related to Plaintiff's performance of his official duties. The Plaintiff cannot maintain a claim against Defendant Lorello.

### The Plaintiff's State Law Claims

■ The Plaintiff's amended complaint also alleges several state law causes of action. Where federal issues are dismissed before trial, district courts should decline to exercise pendent jurisdiction over state law claims. *Gaff v. Federal Deposit Insurance Corp.*, 814 F.2d 311, 319 (6th Cir.1987) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Accordingly, because the Court has granted summary judgment on the Plaintiff's federal claim, the Court declines to exercise pendent jurisdiction over the Plaintiff's state law claims.

### Conclusion

For the above reasons, this Court finds that the Defendants' motion for summary judgment is **GRANTED** on the Plaintiff's federal claim alleging a violation of 42 U.S.C. § 1983, and the Plaintiff's claims alleging state law violations are **DISMISSED WITHOUT PREJUDICE.** This action is hereby **DISMISSED** in its entirety.

**IT IS SO ORDERED.**